Staples, J.
As a general rule the purchaser at a judicial sale is required to pay the consideration for the estate, although it be destroyed or taken from him by superior title before a conveyance is executed. For the purposes of this case, it is unnecessary to state either the modifications or exceptions to this rule. The question to be considered is, whether the sale here is of that character. The written agi’eement is filed as an exhibit in the cause. It purports to be a memorandum of a contract between R. L. Brown and wife of the one part, and the appellant, as purchaser, of the second part. It recites that the parties of the first part had sold the property upon certain terms therein mentioned; that the purchaser was to make a payment of two thousand dollars upon the delivery of a “good deed,” and to execute his bonds for the deferred instalments; and that said Brown and wife had agreed to give possession of said property to the vendee not later than the 15th July 1870, and also to procure the approval of the proper court to the contract without charge or cost to the purchaser.
It is impossible to regard this in any other light than a private contract of sale and purchase. The court was *98 not asked or expected to make, but to confirm a sale already made. Its aid was invoked to ratify what had already been done, to sanction terms already agreed by the parties. The vendors believed that they, and others in whose behalf they acted, had a perfect title to the property, and they undertook with the aid of the court to convey such title. The evidence in the record establishes that fact. The agreement to make ‘*a good deed” is not simply a covenant to execute a deed in legal form with proper warranty, but to convey a good title. This was conceded in the argument, and is well settled upon authority. Fry on Specific Performance, and cases cited in note, page 347; Fletcher v. Bulton, 4 Com. 397.
It would be most unjust to apply to a contract of this character the principles governing judicial sales. The purchaser at such sale perfectly understands that the court does not undertake to convey a good title, and that it is his duty to make all necessary inquiries in regard to the estate he is purchasing. But when the purchaser has stipulated for a good title, is he to be compelled to take a defective One because the court had rendered a decree approving the sale ? It is idle to say that a conveyance under the decree satisfies the covenant for good title, when in fact there is no good title.
When a person purchases at a judicial sale, he thereby becomes in a certain sense a party to the cause, and submits himself to the jurisdiction of the court. In this case the appellant was no party to the suit for confirmation in any sense. It does not appear that he was even apprized of the court in which it was pending until after the decree was rendered. The contract was entered into on the 30th of June 1870. The suit was instituted without process on the 9th of July ; the bill and answers filed, decree obtained, and deed prepared on that day. Shortly thereafter, within four or five days, the appellant was first informed of the difficulties in respect to the title. Immediately, without an hour’s delay, orally *99 and in writing, he communicated these difficulties to the appellees, and informed them of his determination not to have anything to do with the property in the confusion and uncertainty attending the title. The trustee replied through his council, that he was prepared to deliver the possession and to make a good deed, and any objections made to it “ were erroneous or imaginary.” If, under these circumstances, the appellant had accepted the deed and the possession, made the payment as agreed, and executed his bonds for the deferred instalments, it is clear he would have thereby waived every objection to the title, and effectually precluded himself from any valid claim to relief or indemnity. If authority were necessary in support of this proposition, it may be found in Daniel et als. v. Leitch, 13 Gratt. 195, 212. In 1 Sugden on Vendors, the rule, is thus expressed: “Where difficulties occur in making out a good title, the purchaser should not take possession until every obstacle is removed.” The reason is that such a measure will generally be regarded as an acceptance of the title. Fry on Specific Performance, 868.
It seems to me, therefore, that the appellant is not precluded by the decree of the court, nor by anything that has occurred, from abandoning the contract. It only remains to consider whether he was justified in so doing. And this brings me to the question whether the vendors, at the date of the sale, or at any other time, were able to make a good title according to the terms of their covenant; if not, what effect this had upon the rights and obligations of the parties.
The appellant suggests various objections to the title. I propose merely to consider those which relate to the incumbrances upon the property.
It appears that the Misses Gordon, under whom the vendors claim, in the years 1856 and 1857, received from the Lynchburg Building Fund Association au advance of $2,040, for the redemption of their twenty-one shares of *100 stock in said association; that they executed their bonds with condition to pay all monthly dues, interest, fines, an<^ charges for which they might be liable according to the constitution and by-laws of the association. They a^s0 gave two deeds of trust upon the property in controversy, containing various clauses and covenants not necessary to he particularly mentioned. They are such as are usually found in mortgages and trust deeds executed to these associations in this State. It further appears that the Misses Gordon punctually paid all their dues prior to the 31st December, 1863; but have been in arrear since that time.
Subsequent to the 1st January 1863, all dues and instalments were paid by.the members in Confederate-treasury notes ; and the association has sustained heavy losses by investments in that currency, having now on-hand about $28,000 in Confederate bonds. Since 1864 it has ceased active operations, although the constitution and by-laws require its continuance until ^each, share is of the value of two hundred dollars.
The first question suggested by these facts is, whether the holders of the four hundred unredeemed shares, who have received nothing, may not require that the association shall resume and continue its business until their shares attain their par value; and further, whether the property in' controversy may not at any time be sold, under these trust deeds, for all the arrears and delinquences of the Misses Gordon since 1863, including' monthly instalments, fines and interest, and other dues.
And secondly, if such sale shall be made, will not the-trustees be required also to receive and set apart a sum sufficient, with other contributions, to give to the shares-the value agreed upon in the constitution and by-laws;. and how is the necessary amount to be ascertained—upon what principle is the calculation to be made? Thirdly,, whether the debtors to the association—they whose shares have been redeemed—may insist that the associa *101 tion shall be at once dissolved, and their estates released from the liens thereon; and if so, upon what terms are they to be released ?—how is the account of losses to be stated and adjusted, and how apportioned between those who have received all the available funds and those who have received nothing?
These are perplexing and difficult questions, which, in * the language of the commissioner, can only be settled “after protracted and uncertain litigation.” ÍTo subject has created more embarrassment and difficulty with the courts and the profession than that which relates to the rights, powers and duties of these building associations. At the present term a number of cases have been argued before us, involving questions of a complex character, and occasioning almost endless diversity of opinion. It is understood that many others are pending in the courts below, presenting the identical questions suggested by this record. The whole matter is confessedly involved in doubt and obscurity, justifying the remark of an English chancellor, that their “ articles are, to a considerable extent, unintelligible, and not very consistent;” so that it is now generally agreed the rights and duties of these associations, the proper construction of their charters, and the liabilities of the several stockholders, the nature, operation and effect of the bonds and mortgages, can only be settled by the courts. In the present case the treasurer states that by reason of the nature of the obligations of the Misses Gordon, and the losses of the association being wholly uncertain, it is impossible to make an estimate of the amount of their indebtedness. In the language of Chief Justice Marshall, in Garnett v. Macon, 6 Call, 309, 367, “It cannot be doubted that these difficulties, if presented to the mind of a prudent man, contemplating the purchase of an estate, and desirous of performing his contract according to its terms, might have serious influence on Ms conduct, and might deter him from making the pur *102 chase. If informed of them after making the contract, but before its execution by the paying of the purchase money and receiving a conveyance, he would have such strong motives for stopping entirely, or, at least, for pausing until the impediments could be removed, as-would, I think, justify him for so doing, in the opinion of any reasonable man.” These observations apply with peculiar force in this case." The object of the appellant' in making the purchase was to open a large female-school in the building at an early day. The property demanded repairs of an extensive character. The establishment of the school required a considerable outlay of money in the beginning.- Under these circumstances, the appellant might well refuse to complete the purchase of property liable at any time to be sold, subject to incumbrances of unknown amount, and the very possession of which might expose him to expensive and vexatious litigation. Ho one supposes, for a moment^ that the-appellant would have made the purchase had he been-apprized of the condition of the title. Why was he not informed of it ? Mr. Brown admits that he knew of the existence of the incumbrances shortly after the property was purchased from the Misses Gordon. His apology, for failing to communicate the fact to the appellant is, that he had particular assurances from Mr. J. H. Gordon., the liens should be removed, and he thinks Mr. Gordon told him it had been done. Ho one attributes to Mr. Brown any fraudulent intent, but it was his duty to inform himself accurately before undertaking to represent to the purchaser the state of the title.
In the case of Garnett v. Macon, before cited, Chief-Justice Marshall said: “In a contract for the purchase-of a fee simple estate, if no incumbrance be communicated to the purchaser, or be known to him to exist, he-must suppose himself to purchase an unincumbered estate.” In answer to the argument made at the bar, that the decisions were confined to cases where the title was- *103 doubtful, and not where there was a mere money charge upon the estate, he said: “The objection is not entirely confined to cases of doubtful title. It applies to incumbrances of every description which may m any manner embarrass the purchaser in the full and quiet enjoyment of his purchase. There is certainly a difference between a defined and admitted charge, to which the purchase money may by consent be applied when it becomes due, and a contested charge, which will involve the purchaser in an intricate and tedious law suit of uncertain duration.”
I do not deem it necessary to quote any other authority in support of this doctrine. It is fully sustained by the cases of Freer v. Hessee, 21 Eng. L. &. E. R. 82 ; Salisbury v. Hatcher, 6 Jurist, 1051; 1 Sugden on Vendors, 7th Am. edi., p. 84; Hunt v. Saunders, 1 Monr. 219; Sturtevant v. Jaques, 14 Allen R. 523. See also cases cited in 2 Dan. Ch. Prac. 989, note.
It is true that specific performance will be decreed in some instances where the vendor is prepared to comply with his covenants at the hearing, and the court will afford him a reasonable time to remove incumbrances and perfect his title. But this is a matter of favor to the vendor, only to be granted in cases which admit of such relief without prejudice to the rights of the vendee. This indulgence will not be granted where the defect to be remedied was known to the vendor or his attorney at the time of the contract, and was concealed from the purchaser. In Dalby v. Pullen, 3 Sim. R. 29, a defect in the title, though known to the vendor’s solicitor, was not communicated to the purchaser. “The vice-chancellor said that the parties by such conduct had precluded themselves from the benefit of the rule which prevails in the court, as to the time allowed to vendors to remove objections to the title. And accordingly, a motion by the purchaser to be discharged from the purchase was granted, though the vendors had removed the defect before the mo *104 tion was made. See also Lechmere v. Brasier, 2 Jac. & Walk. R. 287, Fildes v. Hooker, 3 Mad., 1 Sugd. Vend. 350. And more especially will such indulgence be denied where, besides a failure to disclose the existence of incumbrances, an account is necessary to ascertain the state of the title, the extent, nature, and amount of such incumbrances.”
I have seen no case in which it has been held that a purchaser has been required to await the institution of a suit, and the settlement of contested accounts between third persons, to afford the vendor an opportunity of removing incumbrances and perfecting his title. Dart on Vendors, 70; Sidebotham v. Barrington, 3 Beav. R. 528 ; Fosters v. Hoggart, 14 Jurist, 757; Arnot v. Briscoe, 1 Ves. Sr. 94.
It is very questionable whether, under these circumstances, a court of equity would decree in favor of the vendors, even if no change had taken place in the condition of the estate. Inasmuch, however, as the property which was the,sole inducement to the purchase, has been destroyed by fire, without the fault of the vendee, before the vendors were in a condition to remove the cloud upon the title, it would seem very clear it is not a case for specific performance. Where an event happens which determines the existence of the subject matter of the contract, the important inquiry is, was the contract at the time so concluded as to change the right of property, and to vest it in the purchaser? One of the earliest eases on this subject is that of Wyvill v. Bishop of Exeter, 1 Price Exch. R. 294. McDonald, Ch. B., said a court of .equity will enforce specific performance without regarding which party may be benefitted or prejudiced by the accident of unforseen events, where the purchaser has actually accepted a title after a contract of sale; but where the purchaser has not accepted the title, the court refuses to decree performance. In Paine v. Mellar, 6 Ves. R. 349, Lord Rosslyn did not consider such acceptance necessary, and he accordingly directed an inquiry *105 whether a good title could he made. In that case objections were made to the freehold title; the premises were also subject to a charge for certain annuities, but a trust of stock had been declared for their payment. The purchaser, however, waived his objections to the title, and agreed that he would complete the purchase upon receiving an indemnity against the annuities. Before the indemnity was given the premises were destroyed by fire. Lord Eldon said, it is clear the objection was given up as to the freehold title, and the only difference was as to the indemnity against the annuities affecting these with other premises. Notwithstanding, he refused to decree a specific performance unless it appeared the purchaser had actually accepted the title; and accordingly a special reference was directed as to the fact of the acceptance, lie further said; “As to the mere effect of the accident itself, no solid objection could be founded upon that simply, for if the party, by the contract, has become in equity the owner of the premises, they are his to all intents and purposes. It therefore becomes important, in cases of this sort, to ascertain the period at which the purchaser is to be regarded as the owner. He certainly must be so considered from the date of the bargain, where the vendor is in no default, and is prepared to convey a clear title. But if, according to the cases, a court of equity will not compel the purchaser to accept a title which the vendor cannot make out to be clearly good and free from incumbrance, how is the purchaser to be regarded as the owner till these objects are effected, and the vendor is prepared to make the title according to the contract. In Carrodus v. Sharp, 20 Beav. R. 56, a bill was filed for the specific execution of an agreement to purchase a mill, and a decree was made in September 1854, but a good title was not shown until the following December. A question arose as to who was to bear the expense and outgoings belonging to the mill, and to the repairs and sustenation of the premises and the machin *106 ery. Sir John Romilly decided that these must he borne by the vendor up to the time at which a purchaser could prudently take possession, which is the time at which a good title is shown; and after that by the purchaser. It is perfectly clear that the same principle would have thrown upon the vendors a loss resulting from an entire destruction of the property. See also Monro v. Taylor, 8 McN. & Gor. 713 ; Fry on Specific Performance, § 895 ; Sleut v. Bailis, 2 P. Wms. R. 220; 1 Sugd. Vend. 39, 389; Cass v. Rudele, 2 Vern. R. 280; Ex parte Minor, 11 Ves. R. 559.
I have had occasion already to quote from the opinion of Chief Justice Marshall in Garnett v. Macon. It must be borne in mind, that the purchaser there resisted a-specific execution of the contract, upon the ground of a charge upon the property for the payment of debts cheated by a previous owner. In the progress of the suit, however, the encumbrance had been removed. Judge Marshall said : All the parties are now before the court, and if a specific performance should be decreed, the title which can be made to Macon will, undoubtedly, stand clear of Campbell’s lien. The question, therefore, is whether the contract ought now to be enforced. He then proceeds to consider how far time is the essence of a contract for the sale of real estate, declaring the rule to be, if a bill-for a specific performance be brought by a party who is himself in fault, the court will consider all the circumstances of the case, and decree according to these circumstances. He then concludes by saying: “As I think Campbells claim was a cloud hovering over the title Garnett could convey to a purchaser with notice, which justified Macon in refusing to go on with the purchase, which cloud could not be dissipated but by the decree of a court of chancery ; and as before such decree was attainable the value of the article has greatly changed, that circumstance creates a strong objection to specific performance.”
*107 It is obvious Judge Marshall was of opinion that any loss occurring to the property before the vendor was in a condition to convey a clear, unincumbered title, must fall on him, and not on the purchaser. And this is the result of all the cases. In the present case the incumbrances were subsisting at the hearing, nor does it appear that they have yet been removed. Under the decree of 7th March, 1871, leave was given to the plaintiffs and. appellees here to amend their petition, and make the association and the trustees under the deeds of trust executed by the Misses Gordons, parties defendant to the suit, in order to settle and adjust what balance may be due, if any, to said association. It is also stated, that because of the difficulties arising out of the perplexing condition of the association, a suit has been instituted to wind Up its affairs. The purchaser must, therefore, await the settlement of the various questions arising in this suit, and the termination of a protracted controversy, before the character, natui'e, and extent of his liabilities can be ascertained.
It was argued that the purchaser cannot complain, be cause no day was fixed for the conveyance of the title. The articles of agreement unmistakably show the understanding of the parties, that the deed should be made so soon as the approval of the court could be obtained. And such clearly was the view of the parties making the sale. They did not ask for delay that the cloud upon the title might be removed. They tendered a deed with special warranty shortly after the decree as a literal performance of their covenants. "Was this a compliance with the contract ?—was the title offered the appellant the title he had agreed to accept ? Unless it can be so held, the tender imposed no obligation upon him. He was bound to take a conveyance only when a good title was offered. Conceding that he could not object, if they asked for delay, still he had the right to insist they should perform all they had engaged to perform, *108 before he could be required to accept the title, or the ownership! of the property. Not having done so, the loss ' must fall upon them and not on him. Foster v. Hoggart & als., 14 Jurist, Part 1, 757 ; Counter v. McPherson, 5 Moore, Privy Council Cases, 83. Thisis a hard case upon the appellees, and deeply^to be lamented. It would be equally hard upon the appellant, who is in no ^default, to compel him to pay the consideration for property no longer in existence. With the greatest possible respect for the learning and the ability of the judge in the court below, I think the [decree rendered by him must be reversed for the reasons stated.
The other judges concurred in the opinion of iStaples, J.
Decree reversed.