ANDERSON, J.
The execution of the deed of December 1860, by Gillespie to Hendricks, was not a performance of his executory contract of the 14th of *Jttne. He was bound not merely to make a deed, but to procure and convey a good title with general warranty. Was he invested with a good title himself at the time he executed said deed to the lands conveyed by it, or to which he was bound by his contract to make a good title?
He was bound by his contract to make a good title to the following tracts, to wit: First, Samuel W. Cecil’s tract, shown by survey to contain 317 acres, described as formerly belonging to Cecil, and sold by him to John C. Harrison. The record shows no conveyance to Harrison.
Next, a tract patented to Chapman and Perry, except a small portion sold to Cornelius McGuire. The tract contains 1,072 acres, as shown by survey. There is a deed from Chapman and Perry to Gillespie, bearing date 29th of December, 1860. But the record shows that it had been previously sold by them to John C. Harrison for $1,000, which he had paid; and there is nothing to show that this conveyance was made to Gillespie with the assent of Harrison.
Next is a tract formerly belonging to James M. Whitt, and by him sold to Gillespie. There is a deed from said Whitt to Gillespie, dated November 14th, 1853, conveying a tract containing 225 acres. But it appears on the face of the deed that it was patented to said Whitt and James Oney jointly ; and there is no evidence that Whitt had ever acquired Oney’s part.
The next are two tracts formerly belonging to Harve3r Whitt.
There is a deed from Harvey Whitt to Gillespie, for only one tract, containing eighty-four acres. The plat of survey shows that Harvey Whitt had two tracts within the bounds of the survey, only one of which appears to have been convej'ed to Gillespie.
*Lastly, all that portion of fifteen hundred acres of land which formerly belonged to Gillespie, lying west of the Pounding Mill, which said Gillespie formerly sold to John C. Harrison. This tract is laid down on a map accompanying the record. And that portion of it which lies west of the ‘ ‘Pound Mill’ ’ is described on the map, and embraces four tracts, which are excluded from the boundary which Gillespie claims to have sold and conveyed to Hendricks, to wit: Hannah I/inkous 33 acres, Samuel Cecil 92 acres, Hinkles’ patent, now Oney’s, 110 acres, and a part of James C. Williams, west of the “Pound Mill,” quantity not given, but which contains perhaps between eighty and one hundred acres. These tracts are all parts of the tract of fifteen hundred acres lying west of the “PoundMill;” and the record does not show that they were excluded from the sale made by Gillespie to John C. Harrison. Unless they were, they would seem to be included in the sale made to Hendricks, being parts of the survey of fifteen hundred acres lying west of the “Pound Mill.” Yet they are excluded by the survey which Gillespie caused to be made, and by the deed in question.
It appears that Hendricks was aware of their exclusion, for he was along when the survey was made. But there is evidence that he was disappointed and dissatisfied with the running of these lines on the north side of the survey, although he agreed to make an exchange with Oney of a small *354 parcel for their mutual benefit, to give better shape to their several tracts. This act, we think, could not be regarded as a waiver of the objection. It implies only, that however confident he may have been that the said lands were embraced in the sale to him, he was satisfied, as shown by the survey, and doubtless by the disclaimer *of title by Gillespie, that they did not belong to him; and upon this ground he did not contemplate a rescission of the contract. He had been put in possession under the contract, and had paid part of the purchase money; and expecting the contract to be performed in other respects by his vendor, he did not intend to surrender it for this cause.
The fact of his .possession could not be used against him, because he was authorized by the contract to take possession before the title was made. 1 Sugd. Vend, top p. 518, chap, ix, l 1, art. 20. Nor can his act of exchange implying ownership. Because acts of ownership, after an authorized possession, are of no importance; for what can be the purpose or advantage of taking possession except to act as owner? Ibid, art. 23. We do not think therefore that the continued possession of Hendricks, or the exchange he made with Oney, amounted to an acknowledgment that the survey was made in conformity with the contract, or a waiver of his objection.
But if it could be a waiver of the objection, upon a further discovery of objections arising out of the misdescription he might rescind the contract. 1 Sugd. Vend, top p. 508, bottom 331, chap. 8, ? 4, art. 25.
This survey also includes Miles Claypool’s entry and survey of 96 acres; also James Oney’.s of 336 acres, and nearly the whole of Thomas Davis’s of 114 acres, which are not mentioned in the contract.. Whether the rights which accrued under them have been extinguished by Gillespie the record does not show.
It also includes a large portion of the Samuel W. Cecil tract of 317 acres, a considerable part of the James M. Whitt tract of 225 acres, and a small part, perhaps eight or ten acres, of the Harvey Whitt tract of 92 acres; all of which were expressly sold by Gillespie *to Hendricks, as distinct and separate tracts, from that portion of the 1,500 acre tract lying west of the “Pound Mill” and of the Chapman & Perry tract of 1,072 acres; the whole supposed to be twenty-five hundred or three thousand acres, more or less. And the said Gillespie bound himself to have the boundary of said lands surveyed, and to convey a good title to them, with general -warranty, to the said Hendricks,! ‘by metes and bounds, as one tract; and should any of the tracts composing said boundary not join, or should there be any land between them, not embraced within their lines, said Gillespie binds himself to procure title to said adjacent or vacant lands, and convey the same, with general warranty, to the said Hendricks as part and parcel of the boundary sold him.” The articles further stipulate that Gillespie gives possession to Hendricks of all the lands except that in cultivation, which he binds himself to give possession of on or before the 1st day of March 1861. He also binds himself to have an entry made by John C. Harrison, of 500 acres, surveyed and carried into grant, and to convej' the same, or have it conveyed, with special warranty to said Hendricks. And this land is not in the said deed of 1860, and had not been surveyed when the said deed was made. He also binds himself to enter, survey and obtain a grant for any other vacant land not included in the said John C. Harrison’s entry, and adjoining the same, and to convey the same, with special warranty, to Hendricks, the said Hendricks paj'ing one-half of all the expenses incurred for entering, &c., beyond the 500 acres of John C. Harrison. In consideration whereof the said Hendricks agreed to pay $22,600, of which he has paid $4,600 due him b3r John C. Harrison, which said Gillespie takes without recourse; to execute "x'a negotiable note for $2,000, payable at six months, which was given and has been paid. And for the residue he executed three bonds to Gillespie: one for $5,000 payable May 15th, 1861; another for $5,000, payable May 15th, 1862; and the third for $6,000, payable May 15th, 1863; which bonds Hendricks was to have the privilege of discharging by assignment of cash bonds on solvent persons, provided the assignment be made in time to enable the said Gillespie to collect the same by due course of law, by the da3r the bond falls due, which the assignment was made to discharge. Sundry payments have been made since the death of Hendricks by his administrator.
We will now return to the map, 'from which it appears that the Chapman & Perry tract lies on the south side of the 1,500 acre tract, and slightly interlocks with it at one place, and at another place there is a small parcel of land lying between the two surveys, to which Gillespie shows no title whatever. It also appears that a tract of 117 acres, belonging to Francis McGuire, lies between the Harvey Whitt survey and the Chapman & Perry survey, and adjacent to them, which is not included in the survey which Gillespie bound himself to have made, nor in his deed of December 1860. It also appears from the deed of Joseph Bar-bareux and wife to the said Gillespie for the 1,500 acre tract, bearing date September 9th, 1850, that the same is a part of a tract of 5,200 acres which was granted by the commonwealth to Henry Banks, by patent bearing date the 25th of February, 1795. And it does not appear that the said Bar-bareux had any title to the same. It is evident also from the survey aforesaid that a part, probably the whole, of the Chapman & Perry survey, which was not patented until the 1st day of August, 1850, is covered by the said Banks’ patent.
*The deed of Gillespie and wife of December 1860, before referred to, was acknowledged by said Gillespie before the *355 clerk of Tazewell county on the 31st day of December, 1860; and by his wife before a notary on the 22d of March, 1861, and deposited in the clerk’s office; and was not recorded until 29th of January, 1863. A. Hendricks died in October 1861, leaving a widow and infant children his heirs at law. He paid, previous to his death, $6,600, including the Harrison bond; and further payments were made by his administrator after his death. This suit in equity was brought in July 1868 by Gillespie against the administrator and the widow and heirs of said Hendricks to enforce the vendor’s lien and subject the land to sale, to satisfy the balance of .the purchase money. It is virtually a bill for specific performance.
The deed of December 1860 is set out as constituting the contract between the parties sought to be enforced; and no allusion is made to the executory contract of the 14th of June. The answer of the heirs denies that said deed was ever delivered to their ancestor, or accepted by him as an execution of the contract, or that he had any knowledge of its existence. We think the fact, as shown by the evidence and admissions of Gillespie, is most probable, as stated by the answer; and that said deed is not therefore any evidence of a contract between Gillespie and Hendricks binding on the latter or his heirs. Nor can it be regarded as an execution of the contract on the part of Gillespie, who was bound not merely to make a deed, but to procure and convey a good title in fee to Hendricks with general warranty. That, it is clear, was not done by the execution of this deed; for, at that time, he had not an unquestionably good title to a large portion, if any, of the lands conveyed by it; *and there is strong presumptive evidence that a large and valuable portion of the lands, which were sold to Hendricks, were not conveyed by the said deed. The executory contract of the 14th of June, 1860, remained therefore unexecuted. The bill sets out the deed as the contract which it seeks to enforce, and makes no allusion to the contract of June the 14th; and as it appears that Hendricks was not a party to the deed, the bill ought strictly to have been dismissed. But the defendant having answered and admitted the contract of June, which he sets out in his answer, we will consider the case as if the bill had been amended and sought to enforce that contract. And, thus viewed, is it a case proper for specific performance?
In Garnett v. Macon & als., 2 Brock. 185, 244, which is a leading case, and has received the approval of this court, Chief Justice Marshall says: “Both on principle and authority, I think it is very clear that a specific performance will not be decreed on the application of the vendor, unless his ability to make such a title, as he agreed to make, be unquestionable. In a contract for the purchase of a fee simple estate, if no incumbrance be communicated to the purchaser, or be known to him to exist, he must suppose himself to purchase an un-incumbered estate; and a court of equity will not interpose its extraordinary power of compelling a specific execution of the contract, unless the person demanding it can do himself all that it is incumbent on, him todo.” “This objection (the Chief Justice said) is not confined to cases of doubtful title. It applies to incumbrances of every description, which may, in any manner, embarrass the purchaser in the full and quiet enjoyment of his purchase.” The doctrine on this subject is fully and clearly stated in a *recent decision of this court; J. Staples delivering the opinion. Christian v. Cabell, 22 Gratt. 82,
A court of equity is anxious to protect a purchaser, and give to him reasonable security for his title; not compelling him to take a title, not knowing whether it is good or bad. 1 Sugd. Vend., top p. 577, chap. X, $ 3, art. 1. To enable a court of equity to enforce a specific performance against a purchaser, the title to the estate ought, like Caesar’s wife, to be free even from suspicion, for it would be an extraordinary proceeding for a court of equity to compel a purchaser to take an estate which it cannot warrant to him. It has, there, fore, become a settled and invariable rule-that a purchaser shall not be compelled to accept a doubtful title. Nor will he be forced to take an equitable title. Ibid, art. 3. To apply these well established principles to the case in hand, it is evident that the vendor was not, when he executed the deed of December 1860, in a condition to demand of Hendricks a specific performance of the contract; nor was the execution of said deed a performance of the contract on his part. If it had been tendered to Hendricks, as an execution of the contract, he would have been justified in rejecting it. But it is evident that the deed was never tendered to Hendricks, and the probability is, that he died without the knowledge of its existence. Gillespie seems to have contented himself with that act as a performance of the contract on his part; and when he filed his bill in this suit, in August 1868, was in no better condition to perform the contract on his part, or to demand the specific performance on the part of the heirs, than he was in December 1860. The final decree, dissolving the injunction, which had been awarded to judgments at law for the purchase money, except as to the sum of seventeen hundred and eighty ^dollars, as to which it was perpetrated, and enforcing the vendor’s lien for the residue, was pronounced in the cause on the 5th day of October, 1871. It is contended, on behalf of the appellee, that at the date of said decree he had perfected his title, and had given to the heirs of Hendricks all necessary and proper assurances of title.
If there has been no unnecessary delay, courts of equity will sometimes decree a specific performance in favor of the vendor, although he is unable to make a good title at the time of filing his bill, if he is in a situation to make such a title at or before *356 the time of the decree. 2 Stor. E)q. Juris, ch. 18, % 777. But if the vendor has been long' in default, and in the meantime a change of circumstances has taken place, unfavorable to the party resisting the demand, a court of equity will not compel specific performance. Garnett v. Macon & als., 2 Brock. R. 185; and Bryan v. Lofftus’ adm’or, 1 Rob. R. 12. In this case, more than eleven years had elapsed from the date of the contract before the vendor had perfected his title, and was prepared to perform the contract on his part, if he has ever perfected his title, and has ever been prepared to perform the contract. The first deferred installment of the purchase money was due on the 15th of May, 1861; the payment of which the vendor had no right to enforce, until he was prepared to make the purchaser a good title. He was not in condition to perform the contract at that time, and was not until 1871, shortly before the decree was pronounced, if he was then. Admitting that he had then perfected his title, he had been in default for a period of ten years; during which period the most extraordinary- . . . change of circumstances had taken place that had ever occurred *in this or perhaps any country, and which were unfavorable to the party resisting specific performance. In the above case of Garnett v. Macon, Chief Justice Marshall, after adverting to the change of circumstances which had taken place between the time when the vendor ought to have been prepared to' perform his contract and the time when he had perfected his title, says: “The same property which, if sold in time, would probably have enabled him to pay for Mantapike, would not, on any reasonable estimate, now enable him to do so.” If Gillespie had been in condition to perform his part of the contract, and to demand payment of the first bond when it was due in May 1861, or when the second bond became due in May 1862, property which might have been sold to satisfy them, afterwards, by the results of the war, became utterly worthless to his estate. Or it may be fairly presumed that the whole of the deferred installments might have been paid in solvent bonds, with which he was authorized by the contract to pay them, which have become utterly worthless, as alleged by the heirs in their answer: and that there has been a general decline in the value of lands is a fact of public notoriety. The other case of Bryan v. Lofftus is analogous to this.
In that case, as in this, the purchaser had been put in immediate possession, and had made large payments. In 'that case, as in this, tjae purchaser had retained possession until the date of the decree, and had given no notice of his intention to go for a rescission of the contract until the filing of his : answer — in that case seven years after the ■ date of his contract. In this case it was , nine years and some months. But the purchaser died the next year after he : made the contract, *his heirs being ; infants, all of whom remained in their : minority probably for several years, and some of whom were still in their minority when this suit was brought. Judge Cabell delivering the opinion of the court in that case said: “It was not for the heirs of Doff-tus (the vendor) who had always been in default, and who were never in a situation to comply with the contract of their ancestor, to object to the conduct of Bryan in not demanding a rescission of the contract. Although Bryan might at an earlier period have objected to going on with the contract, it was not too late for him to do so in 1825; the default of DofEtus’s heirs still continuing.”
In that case, as in this, the purchaser did not surrender the land. Judge Cabell said: “'He had paid neax-ly $4,000 of the purchase money, for the recovery of which he had no hope, Dofftus having died insolvent. I think he was right therefore in retaining possession.” In this case the evidence tends strongly to show insolvency in Gillespie. In that case, as in Garnett v. Macon, the court was of opinion, admitting that the vendor was in condition to make a good title at the date of the decree, and had executed proper deeds for that purpose, his long continued default, and the change of circumstances that had occurred during its continuance, was a sufficient objection to the specific performance.
I might rest the decision of this case upon that ground. But the record presents further objections to specific performance in this case, which I can only briefly notice, as this opinion has already taken up too much time. And first, the record does not show that the vendor could convey a clear, unquestionable title to the heirs of the vendee, even at the date of the decree. The burden is on the vendor to *show that the title is free from reasonable doubt, and that the vendee will not be exposed, by taking it, to litigation. Dwight Sturtevant v. Jacques, 14 Allen’s R. 523, 526; Richmond v. Gray, 3 Allen’s R. 25; Griffin’s ex’or v. Cunningham, 19 Gratt. 571.
: ■ , : ; : The appellee relies upon a deed executed by him to the widow and heirs of A. R. Hendricks on the 26th of April, 1871, whereby he conveys and releases to them the lands on the ‘ ‘Pounding Mill Branch, ’ ’ which were conveyed to him in trust by John C. Harrison, by deed bearing date January 31, 1859, to secure Napoleon B. French as his endorser on a note for $5,000. The lands conveyed by this deed of trust are claimed to be the same which were sold by Gillespie to Hendricks by the contract of 14th of June, 1860, and conveyed by the deed of December 1860. And the said deed of release, of April 1871, recites that the said Gillespie, after due notice as trustee, made sale of the said lands under the said deed of trust at public outcry, and that Joseph Harrison became the purchaser thereof at the price of $5,000 cash. And it further recites, that the said Gillespie, by and with the consent and under an agreement with the said Joseph Harrison, sold *357 the same to A. E. Hendricks, &c. And there is a deed from Joseph Harrison and wife in the record, bearing' date December 12, 1870, granting and releasing all their right and title to the same lands to the widow and heirs of A. E\ Hendricks, in which the recitals are substantially the same as in the deed aforesaid. Do those deeds invest a clear and unquestionable title in the widow and heirs of said Hendricks to the lands conveyed by them? The said Gillespie and Joseph Harrison would be estopped to deny the title of John C. Harrison. And it may be conceded that they invest *in the appellants whatever right and title John C. Harrison had to them. But we have seen that, for several of the tracts embraced in the deed of December I860, no title has ever been conveyed, as shown by this record, either to John C. Harrison or Gillespie. We have seen also, that when Gillespie executed his deed of 1860 to Hendricks, he could only trace his title back for ten years to Joseph Barbareux to the fifteen hundred acre tract; and there was not, and is not now, a particle of evidence in the record to show that said Barbareux had any manner of title to the same. The deed recited that it was part of a tract of fifty-two hundred acres, patented to Henry Banks in 1795, but does not, even by way of recital, show how Barbareux became entitled thereto. And it is very evident, from the survey in the cause, that a part, if not the whole, of the Chapman and Perry tract is covered by said Banks’ older patent.
It also appears that the widow of John C. Harrison was entitled to dower in all these lands, which the said Gillespie and Joseph Harrison, by the deeds aforesaid, are es-topped to deny. It is true there is a deed from the widow of John C. Harrison and her trustee, bearing date November 23, 1870, granting and releasing to Thomas H. Gillespie her right of dower, which would entire to the benefit of the purchaser from him. But previous to the execution of said deed, in January 1869, she had executed a deed of marriage settlement, whereby her intended husband, with whom she afterwards intermarried, and three of his children, became invested with important rights and interest in her dower estate, which are not divested by her said deed to Gillespie, they not being parties thereto, and which remain as an incumbrance upon said lands. The record shows further, that prior to said deed of *trust from John C. Harrison to Gillespie, which was admitted to record on the 29th of August, 1859, there were numerous unsatisfied judgments against the said Harrison, amounting, principal, interest and costs, to $18,000 or $19,000. At least, there is nothing in the record to show that they have ever been satisfied, or ceased to be a lien and an in-cumbrance upon the whole of said lands. These matters of doubt, as to the title and evidences of incumbrance, existed at the date of the deed of December 1860, and presented serious obstacles to specific performance, down to the date of the decree. To the argument, that it is improbable that these outstanding claims will ever be enforced, I reply in the language of Bord Chancellor Sugden: “If any person has an interest in, or a claim upon the estate, which he may enforce, a purchaser cannot be compelled to take the estate, however improbable it may be that the right will be enforced.” 1 Sugd. Vend., top, p. 590, chap. 10, $ 3, art. 24.
There are other serious objections to the enforcement of specific performance in this case, which also operated at the date of the deed of December 1860: the uncertainty as to what lands were sold; the great deficiency in the quantity supposed as represented by the vendor; the great disproportion in the price agreed to be paid, and the value of the lands supposed to be conveyed. As was said in Blessing’s adm’r v. Beatty, 1 Ror. R. 187, 303, “In the absence of all direct evidence, the safest general rule is that an estimate of the quantity by the parties, whether in a contract executed or executory, ought to be taken prima facie to have influenced the price; for quantity is usually an important element in the agreement, and can hardly be supposed to have been disregarded by the parties or to have been unmeaningly stated by *them in a solemn contract. ’ ’ And the question of compensation usually arises, not in sales by the acre, but for a gross sum. And in the latter cases the first inquiry is whether the parties made a mistaken estimate of the quantity, which influenced the price; second, whether they waived the right to compensation by an agreement of hazard. And the courts have a strong leaning against the inference of a contract of hazard; a construction which has in several cases been expressly declared one that ought not to be favored. Hundley v. Lyons, 5 Munf. 342; Keyton’s ex’ors v. Brawford’s ex’ors, 5 Leigh 391. Hendricks is represented to have been a man of good judgment ; and it is not an unreasonable inference from the facts in the record, that the impression was made on his mind that he was getting nearly a third more land than was afterwards conveyed to him. The price he agreed to pay for it tends strongly to confirm this inference. According to Gillespie’s account, it had sold in ojien market, at public auction, for $5,000 in cash to Joseph Harrison, but a few months before Gillespie’s sale to him at the price of $22,600. And in the deed of trust from John C. Harrison to Gillespie, under which said sale to Joseph Harrison was made, the quantity was represented to be two thousand acres. In the sale a few months after by the same Gillespie to Hendricks it was estimated to be from twenty-five hundred to three thousand acres, besides the five hundred acre entry, which it was intimated did not embrace all the vacant land, and that was to be secured for said Hendricks also.
I am of opinion therefore, upon the whole case, to reverse the decree of the Circuit court with costs, and to remand the cause *358 with instructions that the appellants, if they are still in possession, should be required, *as was held in the case of Bryan v. Lofftus, to deliver up the land to Gillespie, and to account for the rents and profits during- the time they and their ancestor held it, and to release all their rights under the contract between Thomas H. Gillespie and A. R. Hendricks, and the deeds in the record exhibited. But the administrator of A. R. Hendricks is entitled to a return of all the purchase money paid by his intestate in his lifetime (estimating the payment made in the bond of John C. Harrison for $4,600 at its value) and by himself, as his administrator, since his death, with interest from the time the same Was paid; and also to have the value of any permanent improvements his intestate or heirs may have made, set off against the rents and profits so as not to exceed the amount; which matters should be referred to a commissioner for an account. And if upon the return of the commissioner’s report it should appear that there was a balance of rents and profits due from the intestate, his administrator should be decreed to pay it, or if from the heirs, they should be decreed to pay it; and any balance in favor of the administrator should be decreed to him. And if there should be no sufficient personal estate of Gillespie out of which it could be made, the land in question should be subject to its payment.
. The other judges concurred in the opinion of Anderson, J.
Decree reversed.