# Richmond.

## WARE V. STARKEY.

### FEBRUARY 5th, 1885.

1. SALES—*Judicial—Private.*—After decree in pending suit, to sell land to pay debts, debtor sells the land by written contract, undertaking to make vendee "sufficient title," takes for the purchase-money vendee's bonds payable to commissioners named in the decree, and a trust-deed on the land to secure them. The sale is confirmed by the court, and its receiver ordered to collect the bonds when due, and apply proceeds to the debts. Such sale is not a judicial, but a private sale. *Christian* v. *Cabell*, 22 Gratt. 82.

2. PRACTICE IN CHANCERY—*Reports.*—Master in his report must not go beyond the matters referred to him, and his report is a nullity so far as it relates to matters not referred to him. Therefore, when master gratuitously reports that certain bonds bear interest only from maturity, and there is no confirmation of so much of the report as relates to such gratuitous matter, the parties are not prejudiced thereby.

3. CONTRACTS—*Construction—Interest.*—Contract of sale, dated August 26th, 1873, says the bonds for the purchase-money are "to bear interest from this date." The trust-deed describes the bonds as "dated September 10th, 1873, with six per cent. interest from August 26th, 1873." The bonds say, "with six per cent. interest from date above," when there is no "date above," except the date of the maturity of the bond. Receiver collected the bonds with interest only from their maturity.

HELD:

   The bonds bear interest from the date of the contract, August 26th, 1873, till paid.

4. PRACTICE IN CHANCERY—*Enforcing trust-deeds—Correcting mistake.*— Debtor having sold the land as above stated, the master having reported as aforesaid, and the receiver having collected the bonds with no interest until after their maturity, it was competent for that debtor

to bring his bill to enforce the trust-deed, or to reform any mistake in any part of the said writings, in order to collect the unpaid interest.

5. PURCHASER WITH NOTICE—*Case here.*—The trust-deed describing the bonds as bearing interest from August 26th, 1873, being duly recorded, C., being about to buy the land of the debtor's vendee, sees the bonds and the contract, and is told that the debtor claimed that the bonds bore interest from the date of the contract, nevertheless purchased the land.

HELD:

C. is not a purchaser for value without notice, and the land in his hands is liable for interest on the bonds from that date.

6. ESTOPPEL—*Written evidence—Parol.*—A party to instruments in writing, in the absence of all pretence of fraud, is estopped from proving that he did not read the instruments before executing them, and thus by parol obviate the effect of written evidence. *So. Mut. Ins. Co.* v. *Yates,* 28 Gratt. 585.

7. WITNESSES—*Professional experts.*—See opinion as to the value of their testimony.

Argued at Staunton, but decided at Richmond.

Appeal from decree of circuit court of Clarke county, entered May, 24th, 1884, in the chancery cause of Josiah W. Ware's administrator against Benjamin Starkey, William B. Claggett, and others.

Opinion states the case.

*M. McCormick* and *Barton & Boyd,* for the appellant.

*McDonald & Moore* and *J. J. Williams,* for the appellees.

RICHARDSON, J., delivered the opinion of the court.

This is a controversy as to whether the six notes or single bills, hereinafter to be referred to, bear interest from the date of the contract of sale, or only from the maturity of the bonds. Before, however, considering the main question, we must dispose of a preliminary question, raised by counsel for the appellees.

It is insisted that the appellant, the plaintiff below, has no

right to prosecute this or any suit in the premises. To properly understand this question, a brief statement is here necessary. On the 26th day of August, 1873, pending a suit in chancery in the circuit court of Clarke, by the style of *Dobbin* v. *Ware*, for the sale of the lands of the late Josiah W. Ware, for the satisfaction of certain liens thereon, and where a decree had been rendered in said suit for a sale of same, and commissioners appointed to make the sale, said Ware (who had died since the institution of this suit), entered into a contract in writing with Benjamin Starkey, whereby he agreed to sell and Starkey to buy, a certain tract of land, in the contract described, at the price of $60 per acre, payable in six annual instalments. The contract provides that the number of acres in the tract should be ascertained by survey as soon thereafter as convenient, and that Starkey was to execute his bonds for the purchase-money to bear interest at six per centum *from this date*, and to be secured by deed of trust on the property. The survey was promptly made, and on the 10th day of September, 1873, Starkey executed to F. W. M. Holliday, S. J. C. Moore, A. McDonald and A. Moore, Jr., the commissioners in the said suit of *Dobbin* v. *Ware*, his six "*notes*," dated the 10th day of September, 1873, and the following is a copy of one of them, all being in the same form:

"On the 26th day of August, 1879, I bind myself, my heirs, &c., to pay to F. W. M. Holliday, S. J. C. Moore, A. McDonald and A. Moore, Jr., commissioners in chancery in the suit of Dobbin and Ware, the sum of six hundred and sixteen dollars and fifty cents ($616.50), with six per cent. interest, from date above, until paid, homestead exemption waived.

"Witness my hand and seal September 10th, 1873.

"BENJAMIN STARKEY, [Seal]"

Then, on the same day (September 10th, 1873), Starkey executed his deed of trust to secure said "six *notes* dated
VOL. LXXX—25

10th day of September, 1873, with six per cent. interest from 26th August, 1873, and payable respectively 26th August, 1874, '5, '6, '7, '8, '9, for the sum of six hundred and sixteen dollars and fifty cents ($616.50) each, homestead exemption waived." The trust-deed was duly recorded.

In the copy of the contract produced in evidence, the last two lines thereof read: "The bonds for the purchase-money to bear interest at six per cent. from this date, and to be secured by deed of trust on the property." In these two lines the words "from this date" are plainly interlined, and admittedly in the same handwriting of the body of the instrument, that of the vendor, Ware.

The sale thus made by Ware was reported to court and confirmed in the case of *Dobbin* v. *Ware,* and the said bonds drawn payable to said special commissioners being at the same time presented in court, were by the court directed to be collected by A. Moore, Jr., as receiver, and the proceeds applied to the payment of the debts of said Ware, ascertained in said suit of *Dobbin* v. *Ware.* In that suit the court then proceeded to ascertain the amount of Ware's debts, to be provided for by a further sale of his lands, after applying the proceeds of said Starkey bonds; and in fixing the amount of said bonds so to be applied, the master commissioner, it seems, without reference to the said deed of trust or contract, but looking only to the wording of the bonds, concluded that they did not bear interest until after maturity, and to that extent discounted their face value, which action of the master commissioner was at the succeeding term of the court confirmed, and the receiver afterwards made collections accordingly.

Starkey paid the first bond, but finding he would not be able to make the other payments, and having been put in possession, and having seeded a crop of wheat in the fall of 1873, in 1875 sold the land to Wm. B. Claggett, one of the appellees, who paid off the said five bonds assumed to be paid by him in

his purchase from Starkey, as demanded by said receiver, A. Moore, Jr.

When the last Starkey bond had become due and was paid, Ware discovered that the receiver had not collected the interest on the bonds, except from maturity; and thereupon Ware filed his bill, to enforce the contract according to its terms, and insisting that, according to the true construction thereof, said bonds bore interest from their dates. At the hearing the court below dismissed Ware's bill, and the case is here on appeal from the decree of dismissal.

Preliminary to the main question, it is contended by the appellees (1) that this is a suit simply to correct an alleged mistake in the execution of said bonds by Starkey; and (2) that the sale of the land to Starkey was a judicial and not a private sale, and therefore nobody, except the court or its officers, has any right to sue in respect to its enforcement.

A glance at the bill filed by Ware will show that, whilst it asks for alternative relief by way of treating the bonds as mistakenly executed in respect to the time from which they should bear interest, the leading feature of the bill is to enforce the contract for the alleged unpaid balance of purchase-money— the complainant insisting in his bill that the true intent and meaning, looking to all the instruments executed in connection with the sale of the land, was that the entire purchase price bore interest from the day of sale, as provided in the contract of sale. The prayer for alternative relief in the event the court should not adopt the main view and purpose of the bill by no means gave to the suit the character of one simply to correct a mistake.

It is in the second place true that there was, in the suit of *Dobbin* v. *Ware*, a decree for the sale of Ware's land, but it is also true that in that situation Ware made sale of a portion of his land to Starkey—land subject to said decree for sale—that he took the bonds payable to said commissioners appointed to sell his land, and tendered to the court said contract of sale,

made in his own name, and said bonds executed as aforesaid in satisfaction to that extent, of said decree against him, and the court accepted and confirmed the sale and received the bonds, directing its receiver to collect the same, and apply the proceeds to Ware's debts proven in that suit. Ware, while he made the sale in his own name, and for obvious reasons took the bonds payable to said special commissioners, took a trust-deed securing the bonds so drawn, and then with his wife conveyed the land to Starkey according to the terms of *his* contract of sale. These terms were for " sufficient title "—*i. e.*, good title—or, in other words, a deed with the usual covenants of warranty. It is manifest the court had no authority to enter into and did not enter into any such covenant. The courts never undertake, therefore, to warrant title to land sold under its decrees. The court only sells such title as is lodged in it by operation of law, and only warrants specially.

A decree for the sale of his land was hanging over Ware; he was struggling to avoid utter wreck; he doubtless believed he could sell, either to his neighbors or others, in parcels to better advantage than a sale under the hammer would be; and therefore he sold this parcel to Starkey, advising him at the time of his purpose to put the contract of sale into the hands of the commissioner of the court to meet to that extent the demands against him in the suit of *Dobbin* v. *Ware.* The bonds and trust-deed were taken, and the latter was duly recorded. The record also shows that the contract and bonds were presented to the court, and that then it was suggested, at the bar, that the bonds only bore interest from maturity, but that Ware, who was present in court, then asserted and claimed that they bore interest from the date of the contract. The court then, in adopting for the purposes of the suit the sale made by Ware and receiving the bonds aforesaid, received them to be enforced according to the real meaning and effect of the contract. The contract and bonds were exhibited in open court, and attention called to the real nature and purport of the contract. The

trust-deed was there of record, and whatever doubt there might be as to the question of interest, if only the bonds were looked to (for they are clumsily drawn), both the contract and the trust-deed concur in giving interest from the date of the contract of sale, August 26th, 1873, as contended by Ware.

The sale thus made was inadequate to the discharge of the debts decreed against Ware, and the court directed its commissioner to ascertain how much more of Ware's land must be sold, after the application of the proceeds of the sale to Starkey, in order to satisfy the debts decreed against Ware in said suit of *Dobbin* v. *Ware.* It was the mistake made by the commissioner under this order of reference and the failure of the court to observe and correct it that has produced this litigation. The commissioner ignored the terms of the contract and deed of trust, and, looking only to the loosely-drawn bonds, came to the conclusion that the bonds only bore interest after maturity, and ascertaining their present value (a matter not referred to him) upon that basis and in that way arrived at, and reported the additional quantity of land necessary to be sold. This unauthorized act of the commissioner, in passing upon a matter not referred to him, could not preclude Ware from the assertion of his rights, if he was injured thereby, even if the court did, at the succeeding term, confirm the report of the commissioner— an act, it may be, of inadvertence on the part of the court, or, it may be, that the matter of interest improperly passed upon by the commissioner and thus involved in his report was not readily discernible, if at all, by an inspection of the report by the court. There is in the record no decree referring to the commissioner the question as to from what time said bonds bear interest. Nor is there in the record any evidence of any decree in terms confirming, or that can be construed as equivalent to a confirmation of the conclusion arrived at by the commissioner, that said bonds only bore interest after maturity.

It is insisted by counsel for the appellees that the action of the commissioner in treating the bonds as not bearing interest

until after maturity was approved by a decree confirming the commissioner's report in that as in other respects. But the record shows that the question, as to the time from which the bonds bore interest, was not referred to the commissioner. That, in fact, was a question to be decided by the court upon inspection of the bonds and other instruments bearing thereon. A commissioner must not go beyond the matters referred to him, and it is laid down, in one of Lord Bacon's orders, that if a master reports as to matter which is not referred to him, his report, so far as refers to that matter, is a nullity. It has been decided that in such a case the proper course is not to except to the master's report, but, before it is confirmed, to apply to the court that it may be referred back to the commissioner to review his report, but that, if no such application is made, and the report should be confirmed, the court will pay no attention to it, except so far as it is warranted by the decree. 2 Daniel's Chy. Pl. and Pr. 1296; 2 Barton's Chy. Pr. 634–5, and authorities there cited. Nor is a commissioner's report confirmed except by an express decree of court. Matthew's Comm's. 144. Minor's Inst., Vol. 4, part 2nd, page 1248.

It is apparent that the sale by Ware to Starkey was a private and not a judicial sale. *Christian* v. *Cabell*, 22 Gratt. 82. This being so, and neither Starkey nor his vendee, Clagett, being parties to the suit of *Dobbin* v. *Ware*, but mere stakeholders in succession, and required to pay the price agreed to be paid by Starkey to the court in the suit aforesaid, it is manifest that the pleadings and parties in that suit were not adapted to the litigation between Ware and Starkey and Clagett of the question about interest, and that Ware was not, by anything that occurred in the suit of Dobbin against him, precluded from the assertion of his rights in this suit, though such rights ought to have been enforced in that suit by collecting the full amount due him—it being to the interest of his creditors, and, therefore, to his interest. And it can make no difference that the suit of *Dobbin* v. *Ware* is still pending, and debts to which the

proceeds of the Starkey bonds, as collected, were applied, remain not satisfied in full; for, if any recovery which may be had in this suit should go to those debts or others, in preference to Ware and his assigns, the legal means for securing the proper application are ample. Ware did, in the *Dobbin v. Ware* suit, all that he could in reason be required to do. He presented in open court his contract with Starkey, and also Starkey's bonds; the matter was then and there discussed in respect to the question of interest, and Ware's claim to interest from the date of the contract asserted. If the court has failed by inadvertence or otherwise to collect by its officer the full amount due upon the Starkey bonds, Ware is not precluded, but it was his duty, as well as privilege, to assert in his own and in behalf of his creditors, his rights under his contract with Starkey. This brings us to the consideration of the main question—from what period do the Starkey bonds bear interest?

It will be observed that while the bonds (described as notes in the deed of trust) provide for "six per cent. interest *from date above* until paid," there is no date above, except in the body of the instrument, which is "August 26th," the dates of the maturity of the bonds respectively in the years 1874 to 1879, inclusive, and that the *dates below*, the date of each of the bonds is September 10th, 1873. It will be observed further that the contract, even if the interlined words "*from this date*" be omitted, provides that the purchase-money bonds shall "bear interest at six per cent.," which necessarily means, in the absence of any provision expressly to the contrary, *from the date of the contract.* Not only so, but the deed of trust which was necessarily executed after both the contract and the bonds, and which is the additional and independent promise of Starkey to pay "six notes dated 10th day of September, 1873, with six per cent. interest from 26th August, 1873," &c., which is not the date of the bonds and trust-deed, *but is the date of the contract,* which, with or without the interlined words, is a contract for interest from its date. These instruments, all bearing upon

the matter in hand, must be read together, and while they are all written by the same unskilled hand, it is by looking at them together that we may with certainty arrive at the true intent and meaning of the parties—the true obligation of the contract. With these circumstances standing boldly forth, it is idle to say that the words "*with interest from the date above*" refer, or could have been intended to refer, to the date of the maturity of the several bonds, for to so construe them would involve the absurdity of making a sale of land and providing for payment at a stipulated time, yet in the evidence of the debt, assuming that it is not to be paid at the time specified. Such a construction could only be warranted in the absence of everything except the bonds to look to, or by some express agreement clearly intended to vary the contract. But here, with the contract before and the deed of trust after the bonds, there can be no reasonable pretext for saying that the bonds do not bear interest from August 26th, 1873, the date of the contract. In other words, it is idle and opposed to common experience to say that the parties meant to contract for the payment of money on a day certain, and at the same time to provide for the payment of interest from that date.· It is obvious that the words in the bonds "from the date above" is the result of a confusion in the mind of the draftsman of the date at which he was writing, with the date and terms of the contract written only a few days before by the same hand; and having this confusion once stamped upon his mind, the draftsman (Ware himself), naturally enough carried the bungling form into each of .the other bonds, all of them doubtless having been copied from the one first written.

But it is insisted by counsel for the appellees that the provision for the payment of interest has been wrongfully interpolated into the contract; and the whole body of the contract being in the handwriting of Ware, the direct imputation is that Ware interlined the words "from this date" after the contract was signed by the parties; in other words, that he committed

the crime of forgery. This is a fearfully severe arraignment of the character and memory of a man now in his grave—especially in view of the fact that the contract, without the interlineation, was a contract for interest from its date; that the trust-deed to secure the bonds has precisely a corresponding provision; and that Starkey signed and executed both instruments, and there being as to the latter no pretence of interlineation or change in any respect.

Starkey seeks to avoid this provision in the trust-deed by saying he did not read it carefully. This cannot avail him. He signed both papers, and he cannot be heard to say he did not read the one or the other. *So. Mutual Ins. Co. v. Yates,* 28 Gratt. 585.

Again: From the facts and circumstances disclosed by the record it was physically impossible for Ware to make any change in the contract after it was signed by the parties, for it is incontestibly established that the copy of the contract in evidence, with the words interlined, was when signed delivered by Ware to Starkey, and by the latter delivered for safe-keeping to Major S. J. C. Moore, a lawyer of experience and integrity, who says in his deposition that the interlined words *"from this date"* were there when he received it from Starkey; and he accounts for the contract all the time from then until produced in evidence. There was at the time of the contract another copy taken and kept by Ware until left by him with Mr. McCormick, one of his counsel in this suit. That copy is lost; but Mr. McCormick says, in his deposition in the cause, that it was left with him, that he recollects no interlineation in it, and that he supposes it was lost in several times removing his office and papers from one place to another.

A number of depositions were taken in the cause, the result of which is that, with or without them, it is impossible to read the contract, bonds, and trust-deed and come fairly to any other conclusion than that it was truly the agreement between the parties that Starkey should pay interest on the entire purchase-

money from August 26th, 1873, the date of the contract. It makes no difference that Starkey afterwards sold to Clagett without interest, as the proof is that Starkey found out he could not pay for the land, and many motives doubtless influenced him to get rid of the land on the best terms he could.

Nor can Clagett complain. For when he was negotiating for the purchase from Starkey he was informed by the receiver, A. Moore, Jr., of Ware's claim about interest, but told by Moore that nothing had been heard of Ware's said claim for then over a year. But Clagett was not satisfied to act on this; but, being informed that the contract was in the keeping of Major S. J. C. Moore, he called on him, and was shown the contract, with the interlined words in it; and now, because Major Moore said to him in response to a question seeking his opinion, that "the interlined words looked a little bad," Clagett, as the holder of the land which he bought subject to a recorded trust-lien, comes and says he is a purchaser for value without notice, when not only were all the avenues of information open to him, but were actually resorted to by him. Upon every principle of justice and right he is a purchaser with notice, and for so much of the debt of Starkey to Ware as remains unpaid, the land in the hands of Clagett is charged and liable.

But after the evidence was closed as to all who had any knowledge of the transaction, the defendants below, the appellees here, went to Washington city and took the deposition of E. B. Hay, a professed expert, and the contract in question underwent his scrutiny. This witness, when asked his age, occupation, and residence, gave himself a spacious introduction. He says: "I am thirty-four years of age; attorney-at-law; residence, Washington, D. C., for the past fifteen years. Besides the above profession named, I have devoted attention to the science of penmanship in every branch, especially that devoted to the comparison of handwriting, for the purpose of detecting forgery, spurious writings, &c., and have been accepted as an expert in handwriting before the courts in the District of

Columbia, Maryland, Virginia, Pennsylvania, and other States; before congressional committees and the executive departments; several prominent cases being the Cameron v. Oliver, in the District of Columbia; the United States v. Griffin, in Virginia; the United States v. Russell and others; script forgery cases, in Yankton, Dakota, and the Springer-Donnelly-Washburn investigation before a congressional committee, in which almost every question pertaining to handwriting became a matter of controversy."

When asked if he had examined the contract here in question, he says: "I have examined the paper with a view to the handwriting and the priority of certain strokes. The handwriting is the handwriting of Ware, or the handwriting of the person who wrote 'J. W. Ware.' The greater part of the body of the handwriting appears to have been at one and the same time, leaving spaces for the name of the party of the second part, or 'Starkey,' to be inserted afterwards. Wherever the name 'Starkey' appears it is written slightly larger, and in nervous handwriting, and with ink that, to the eye, is darker than that used in writing the body of the instrument; after the word 'repairs,' on the nineteenth line, all that follows was written after the body of the instrument, and in the same nervous hand in which the word 'Starkey,' mentioned above, appears to have been written; the ink is darker than the body of the instrument, and the proportion of letters is slightly larger; the seals—that is, the scrolls showing the word 'seal'—were made by the person who wrote the body of the instrument, the word seal being in the same handwriting."

The original paper was produced at the argument, and inspected by this court. Tested by the common experience of persons accustomed to the use of pen, ink and paper, there is absolutely nothing to warrant the main conclusion arrived at by this expert, to-wit—that all of the body of the instrument after the word "repairs" was written after—that is, at a period of time subsequent to that at which the contract was made and

signed. This involves the absurd and altogether unusual piece of carelessness of leaving below the bottom of the writing and between it and the first signature the space of full four blank lines, a space reserved, if we are to take the theory of this witness, sufficient for the purpose, and in which an entire clause of the contract was written after the same was signed by the parties. Common sense and common experience alike reject the idea. And not only so, but the positive testimony of Benjamin Starkey himself, the man who was a party to the contract, and who read it over carefully before signing it, says on oath positively and directly that, except the three interlined words, "from this date," the contract is the same as when signed by him. This so flatly contradicts and overturns the theory and conclusion arrived at by the expert, Hay, that comment is wholly unnecessary. And when we couple with this the facts before referred to, to-wit: (1) that the contract without the interlined words is in effect one for interest from date; (2) that the trust-deed provides for interest on the bonds from August 26th, 1873, the date of the contract; (3) that the copy of the contract kept by Colonel Ware, and left with Mr. McCormick, and by him lost, had no interlineation; and (4) that the copy with the interlined words was taken by the vendee, Starkey, and left for safe keeping with Major S. J. C. Moore, with the interlined words therein when he received it. We say, with these concurrent and conclusive facts prominently standing forth, there is no ground for the charge of forgery aimed at Colonel Ware, and the expert testimony must fall to the ground as utterly useless.

In Wharton's Law of Evidence it is said: "When expert testimony was first introduced it was regarded with great respect. An expert, when called as a witness, was viewed as the representative of the science of which he was a professor, giving impartially its conclusions. Two conditions have combined to produce a material change in this relation. In the first place, it has been discovered that no expert, no matter

how incorrupt, speaks for his science as a whole. Few specialties are so small as not to be torn by factions; and often the smaller the specialty the bitterer and the more inflaming and distracting are the animosities by which these factions are possessed. Peculiarly is this the case in matters psychological, in which there is no hypothesis so monstrous that an expert can not be found to swear to it on the stand, and to defend it with vehemence when off the stand." * * * * "In the second place, the retaining of experts, by a fee proportioned to the importance of their testimony, is now, in cases in which they are required, as customary as is the retaining of lawyers. No court would take as authority the sworn statement of the law given by counsel retained on a particular side, for the reason that the most high-minded men are so swayed by an employment of this kind as to lose the power of impartial judgment; and so intense is this conviction, that there is no civilized community in which the reception of a present from a suitor does not only disqualify but disgrace a judge. Hence it is that, apart from the partisan spirit more or less common to experts, their utterances, now that they have as a class become the retained agents of parties, have lost all judicial authority, and are entitled only to the weight which a sound and cautious criticism would award to the testimony itself. In adjusting this criticism, a large allowance must be made for the bias necessarily belonging to men retained to advocate a cause, who speak not as to fact but as to opinion, and who are selected on all moot questions, either from their prior advocacy of, or from their readiness to adopt the opinion to be proved. In this sense we may adopt the strong language of Lord Campbell, that 'skilled witnesses come with such a bias on their minds to support the cause in which they are embarked that hardly any weight should be given to their evidence.'"

Certain it is that the above philosophic view of the subject is truthfully illustrated in this case. Not only is the main conclusion of the expert absolutely overthrown by the clearly as-

certained, actual facts, but there is not an intimation of impor-
tance in the entire deposition of this witness which is not either
opposed to the common observation of all men in respect to
writing under similar circumstances, or that may not be ex-
plained to every intelligent, practical mind as dependent upon
causes quite the reverse of what the speculations of this skilled
witness lead to. But it is quite unnecessary to go into an ex-
tended analysis of this testimony, though to do so would clearly
expose the utter fallacy and unreliability of the whole story.

In any and every view of the case the decree appealed from
is clearly erroneous, and must be reversed and annulled, with
costs to the appellant, and the cause remanded to the said cir-
cuit court, to be proceeded in to final decree, in accordance with
the views expressed in this opinion.

LACY, J., dissenting, said:

A chancery suit having been instituted in the circuit court of
Clarke county for the purpose of subjecting the lands of one
Josiah W. Ware, to sale to satisfy the liens thereon, by Dobbin
and others, creditors of the said Ware, on the 26th day of Au-
gust, 1873, the said Ware made a sale of certain lands belong-
ing to him to Benjamin Starkey, at an agreed price. The sale
was to be on a credit of one, two, three, four, five and six years,
and the bonds to be made payable to the commissioners of the
court already appointed in the said suit of *Dobbin* v. *Ware* to
sell the land in question; the agreement was reduced to writ-
ing, and signed by the parties. On the 10th day of September,
following, the six bonds were executed by Starkey, for $616.50
each, payable respectively 26th day of August 1874, 1875, 1876,
1877, 1878 and 1879. The following is the first bond:

" On the 26th day of August, 1874, I bind myself, my heirs,
&c., to pay to F. W. M. Holliday, S. J. C. Moore, A. McDon-
ald and A. Moore, Jr.. commissioners in chancery in the suit of

Dobbin and Ware, the sum of six hundred and sixteen dollars and fifty cents ($616.50), with six per cent. interest from date above, until paid, homestead exemption waived.

"Witness my hand and seal, September 10th, 1873.

"BENJAMIN STARKEY. [Seal.]"

The other bonds are like the first, payable as stated above, and were secured by a trust-deed on the land in question, which was conveyed by Ware to Starkey. This sale was reported to the court and confirmed in the suit of *Dobbin* v. *Ware.* The bonds drawn payable to the special commissioners were by the court directed to be collected by A. Moore, Jr., as receiver, and the proceeds were ordered to be applied to the payment of the debts of Ware. The court, in that suit, then proceeded to ascertain the amount of the debts of Ware, to be provided for by further sales of Ware's lands, after applying the proceeds of the Starkey bonds. In fixing the amount of the bonds to be applied to the debts, the commissioner of the court discounted the bonds upon the ground that they bore no interest until maturity. The receiver of the court collected the bonds as if they bore no interest until maturity. Starkey paid one of the bonds, and in June, 1875, sold the land to the appellee, W. B. Clagett, subject to the then existing liens thereon. Clagett paid the remaining purchase-money to Starkey on the first day of February, 1880.

In April, 1882, this suit was instituted by Ware against Starkey, Clagett and A. Moore, Jr., general receiver, and Neill, trustee, in the trust-deed, the object of which is to obtain interest on the six bonds cited, and set forth above from their date to their maturity—that is, one year's interest on one bond, two years' interest on the second, and so on.

It will be remembered that the bonds were executed on the 10th day of September, 1873, in pursuance of a written agreement executed August 26th, 1873; that the date of maturity of each bond was made to conform to, or refer to, the agree-

ment of August 26th, although the bonds were dated September 10th—thus, the first bond maturing in one year. It provided thus on the 26th day of August, 1874, it was to be paid, one year from the date of the agreement—not one year from the date of the bond—and with this all the bonds corresponded. But the said agreement provided that the bonds should carry interest from date, and it was and is contended that, although the bonds declare upon their face that they shall bear interest from the date above, the date of their maturity respectively being written above, yet that, by the agreement of the 26th of August, they were to carry interest from date, the provision in the agreement must prevail. On the other hand, it is insisted that, as the said agreement is interlined, the words "from their date" being written between the lines; that the contract has been altered, and that the bonds must be taken as the evidence of the debt, and the ascertainment of its amount, by the mutual conduct of the parties, the one in executing, the other in accepting and collecting them. Many depositions have been taken in the cause. Ware, the vendor, then living, has testified; Starkey, Clagett, A. Moore, Jr., S. J. C. Moore and others have testified. An expert in handwriting has been employed to give evidence concerning the altered contract, or rather the apparent alteration in the contract; and the cause coming on the 24th of May, 1884, the circuit court dismissed the bill of the plaintiff, and ordered that the special commissioners appointed in the suit of *Dobbin* v. *Ware* execute a release deed to Clagett, releasing the Starkey trust-deed.

Whereupon the appellant applied to this court for an appeal, which was allowed July 7th, 1884.

The first question raised by the appellees here, the defendants in the circuit court, is that the bonds having been taken payable to the special commissioners in the suit of *Dobbin* v. *Ware*, having been reported to the court, and the sale approved, and the bonds collected by the court, in accordance with the report of its commissioner, and the proceeds distributed among the

creditors of Ware according to their claims—that the question raised by this suit has been finally settled in that suit, from which no appeal has been taken. It is contended on the other hand that the question at issue here as to interest on the Starkey bonds, between their date and maturity, was not raised before the court in the suit of *Dobbin* v. *Ware* in such a manner as would enable the court to decide the question, and that it was not decided in that suit. That while the report of the master of October, 1874, in that cause set forth the bonds, and ascertained their present value, discounting the interest before maturity—that nothwithstanding the fact that this report was confirmed by the court—yet the question as to interest on these bonds was not referred to this commissioner by the court, but was reported by the commissioner upon request; and Lord Bacon is cited as saying that if a master reports as to matter which is not referred to him, his report, so far as relates to that matter, is a nullity (2 Dan. Ch. Pr., page 1296), which is true as to impertinent matter, and the same will be disregarded by the court, which deals only with matters pertinent to the inquiry in hand. Generally speaking, it is the duty of the master to meet all the difficulties that may arise in the discharge of his official duty. In some way or other he must so provide as that all the accounts and inquiries directed by the decree shall be fully taken—at least, it is the master's duty to go on with them until he finds a difficulty arising from want of sufficient powers, and then an application must be made to the court, either by the master or the parties, to do that which is necessary to supply the defect of his authority. 2 Dan. Ch. Pr., page 1298. In this State it is the practice for the master to make report where matters of account have been referred to him with any matter specially stated deemed pertinent by himself, or which may be required by any person interested to be so stated; and with reference to a large class of accounts he is expressly so required by statute—chapter 128, section 2, Code of Virginia 1873.

Under the decree of May, 1874, the commissioner was required to audit and report to the court any further liens on said Ware's land, that might be produced before him. In making this report of liens, the commissioner, deducted from their aggregate the amounts which had been paid in various ways, so as to show to the court, the amount of unpaid liens which would have to be provided for in the suit, which was the direct object of the suit, and these bonds and the McClellan bonds, having been received by the court, were reported as payments; and in so reporting them, it was necessary to state their aggregate amount as of that date, which was done, rating them as upon their face they appeared as bearing interest upon their maturity. If he erred in this statement, his report was open to exception and correction by the court; but this was not done; his report was received and acted on without exception and the bonds collected by the court, and the proceeds distributed.

*But this is not all.* On the 3rd day of November, 1874, Ware, not excepting to the report just mentioned, *filed his petition* in the cause, seeking to restrain the further sale of his land, alleging, among other things, as follows: "Your petitioner avers that by the true contract and understanding between him, said Starkey, and McClellan, the said bonds were to bear interest from their respective dates, and he prays that the decree of October term, 1874, in so far as it allows interest against him, *may be reviewed.*" To this petition I find no reference in the opinion of the majority, and it is held that Ware is not precluded by anything in that suit. This petition was rejected, and he did not appeal (this being in the year 1874), but acquiesced until the bonds were all collected, and the proceeds distributed, and then, in 1882, he institutes this suit, and seeks to have this same relief. His application in this suit comes too late, the matter having been decided against him in the suit of *Dobbin* v. *Ware*, in a court of competent jurisdiction, his remedy if any, is in that suit, by appeal to correct any error therein, to his injury. And his bill in this suit was properly dismissed.

It is not necessary to discuss the question of interest on the bonds as raised in this case, but a simple inspection of the bonds, will clearly and unmistakably show that the obligor in the bond, agreed to pay interest only from maturity, the date of the maturity of the note was written in the first line, and the agreement was written in the body of the bond, to pay interest from that date, and that question was correctly so decided by the circuit court in this suit, as well as in the suit of *Dobbin* v. *Ware*, and I am of opinion to affirm the decree of the circuit court in this cause, appealed from.

As to the expert's testimony in this case, without any general comment as to expert testimony, except to say 'that it is often most useful in illuminating the path to truth and justice, and in the hands of discriminating tribunals of justice, is often the only method by which covert criminal acts can be unearthed and exposed, and the undenied fact that experts are sometimes mercenary and sold for a price, is no argument against such testimony in any case where it has been valuable, and not corrupt. But in this case, no expert was required to detect the fact that a bond carried interest from a date expressly set out and declared on its face in plain words.

If one date is at the beginning of the first line of the bond, and the date of its execution at the end of the last line. and it is expressly declared in the bond that it shall carry interest from the date above, that is plain enough without the aid of any expert, as the circuit court decided in a suit between all these same parties nine years before. The obligee or his assignee instituted that suit, and as the contract made before the bonds were executed has the words " to carry interest from date " interlined, it required no expert to detect the fact that *this* provision was interlined, when this suit was instituted, to recover the interest on these bonds between the date of their execution and the date of their maturity—nine years after the principal had been paid and disbursed in the circuit court in the suit of *Dobbin* v. *Ware*, in which these parties were all before the court, and from

which no appeal was taken.   The effect of the trust-deed did
not require the construction of an expert.   This case does not,
and did not, in my opinion, turn upon any discovery of the ex-
pert, although one was employed to examine the altered con-
tract, or the interlined contract.

In my opinion the decision of the circuit court of Clarke
county is plainly right.

The decree was as follows:

This day came again the parties by their counsel, and the
court having maturely considered the transcript of the record
of the decree aforesaid, and the arguments of counsel, is of
opinion, for reasons stated in writing and filed with the record,
that said decree of the circuit court of Clarke county, ren-
dered on the 24th day of May, 1884, dismissing the complain-
ant's bill with costs to the defendants, and ordering the special
commissioner appointed by said court, in the case pending
therein of *George W. Dobbin* v. *J. W. Ware,* to execute a re-
lease of the deed of trust on the land referred to in the pro-
ceedings in the cause, executed by B. F. Starkey on the 10th
day of September, 1873, to S. S. Neill, trustee, is wholly erro-
neous.   Wherefore it is considered that the said decree be re-
versed and annulled, and that the appellant recover of the
appellees his costs by him expended in the prosecution of his
appeal aforesaid here; and the cause is remanded to said cir-
cuit court, to be further proceeded in to final decree, in accord-
ance with said reasons in writing, filed as aforesaid.   Which is
ordered to be certified by the clerk of this court at Richmond
to the clerk thereof at Staunton, and by the latter certified to
the said circuit court of Clarke county.

DECREE REVERSED.