| | |
|---|---|
| 104 | 307 |
| f104 | 386 |
| 104 | 486 |
| f104 | 574 |
| f104 | 575 |
| 104 | 307 |
| 107 | 324 |
| 107 | 582 |
| 108 | 70 |
| 108 | 90 |
| 108 | 262 |
| 108 | 545 |
| 108 | 619 |
| 104 | 307 |
| 109 | 43 |
| 109 | 552 |

BAXTER, Respondent, vs. CHICAGO & NORTHWESTERN RAILWAY COMPANY, Appellant.

*September 28 — October 20, 1899.*

(1–6) *Special verdict: Questions to be submitted: Discretion: Instructions to jury.* (5–13) *Negligence: Personal injury: Proximate cause: Explosion of locomotive boiler: Defects: Evidence: Expert testimony: Photographs.* (6, 7, 9, 11) *Appeal: Immaterial errors.* (14, 15) *Excessive damages: Remission: New trial.*

| | |
|---|---|
| 104 | 307 |
| 110 | ³120 |
| 110 | ¹³346 |
| 53 LRA | 659 |
| 104 | 307 |
| 112 | ¹² 48 |
| 112 | ¹ 55 |
| 112 | ⁰ 59 |
| 112 | ⁴228 |
| 47 LRA | 693 |
| 104 | 307 |
| e113 | ¹⁴140 |
| 104 | 307 |
| 114 | ¹³2 |
| d114 | ¹²295 |
| d114 | ¹²296 |
| 114 | ³480 |
| 104 | 307 |
| 116 | ¹⁵641 |

1. The object of a special verdict is to obtain a decision of issues of fact raised by the pleadings, not to decide disputes between witnesses or controversies over evidentiary facts.

2. The right to a special verdict is satisfied by a submission to the jury of a sufficient number of questions to cover, singly, every material fact in issue under the pleadings which is in dispute on the evidence.

3. In preparing a special verdict, every material fact in issue by the pleadings, controverted on the evidence, affecting the rights of the parties in respect to the final result, should be covered by a question, and those facts from which any such issuable fact may be taken as inferable may properly be omitted, though questions covering such evidentiary facts may be added in the discretion of the court.

4. Where a cause is submitted for a special verdict, such instructions should be given respecting each question as to enable the jury to answer it intelligently, and a refusal to do so, by the rejection of specific requests to that end, is error, if the subject matter of such requests be not otherwise covered by proper instructions; but instructions regarding the effect of an answer, or the answers as a whole, should not be given.

5. A question as to whether defects, found by the jury to have existed under such circumstances that the defendant knew or ought to have known of them, were the proximate cause of the injury, was a sufficient submission of the question of whether defendant was guilty of negligence which was the proximate cause of such injury, in connection with instructions given to the jury, that in order for them to find that such defects were such proximate cause they were required to find from the evidence that the defendant ought reasonably to have apprehended that such defects might probably cause an injury to some person.

Baxter vs. Chicago & Northwestern R. Co.

6. An instruction that the proximate cause, in the law of negligence, is the direct and natural cause, is not proper. It is the natural and probable cause, and from which, in the light of attending circumstances, a personal injury might reasonably have been expected by a person of reasonable intelligence and prudence. Such an instruction, however, is not prejudicial in connection with an instruction limiting what is direct and natural to such things as the person responsible ought in the exercise of ordinary care to have apprehended.

7. The test of whether defendant was guilty of a want of ordinary care in caring for its locomotive boilers, was whether its conduct came up to the customary care exercised by corporations generally in the same line of business, and evidence of an expert as to what care should be exercised to discover defects in such boilers, independent of such general custom, was not relevant except in regard to whether such custom was obviously insufficient; but such evidence was not prejudicial since it accorded with the customary way of inspecting boilers as shown by the evidence.

8. Practical experience of a person, sufficient to fairly show that he is possessed of more than ordinary knowledge in regard to a proper subject of opinion evidence, sufficiently shows competency of such person to give such evidence.

9. The opinion of a witness in regard to the limits of safe boiler pressure, based on a hypothetical question assuming the existence of a material defect not testified to, is error, but not prejudicial where the subject of inquiry is the cause of the explosion of a boiler causing a personal injury, except as bearing on the measure of damages, where the cause of such explosion conclusively appears by other evidence.

10. The claim being that a boiler which exploded and caused the injuries complained of, including the flues thereof, was in a generally worn-out condition, and that because of such condition as to the shell the explosion took place, evidence of the condition of the flues, as well as other parts of the inside structure of the boiler, was proper on the question of knowledge or reasonable means of knowledge on the part of the defendant of the existence of defects in the shell.

11. A plaintiff being in court and no reason appearing why the jury cannot have a view of his injured leg, which is a subject of inquiry, the exhibition of a photographic representation of it and permission to the jury to take such photograph to their room is not prejudicial error if the witnesses on both sides describe the condition of the leg substantially as shown by the photograph, and no request is made that they be allowed to see the original.

Baxter vs. Chicago & Northwestern R. Co.

12. Photographic representations are not proper where the original can be readily exhibited to the jury, unless used to aid in identifying some writing or detecting a forgery.

13. Opinion evidence is the most unsatisfactory kind of evidence that can be produced, and falls to the ground as worthless and insufficient to support a verdict when inconsistent with undisputed facts or reason and common sense applied to other credible evidence.

14. Where a judgment in favor of a plaintiff in a personal injury action is right as regards the legal liability of the defendant, but reversible because of the reception of irrelevant evidence tending to prejudice the jury and increase the amount of their verdict, and because compensation was allowed for a disability which does not in fact exist, the court may properly permit the plaintiff, at his election, to avoid a new trial by taking judgment for such sum as will, in the judgment of the court, do justice to the defendant.

15. In naming a sum for which plaintiff may take judgment in the circumstances above indicated, the right of the defendant to a jury trial is not invaded if the amount be placed as low as in all reasonable probability the jury found by their verdict, independent of the prejudicial elements. That is, the court in such a case should not undertake to say what sum of money will measure the plaintiff's loss, but what sum the jury said, by their verdict, stripped of its prejudicial elements and giving defendant the benefit of reasonable probabilities in respect to the amount of the recovery, will measure such loss.

BARDEEN and DODGE, JJ., dissent.

[Syllabus by MARSHALL, J.]

APPEAL from a judgment of the circuit court for Dane county: R. G. SIEBECKER, Circuit Judge. *Reversed.*

Action by an employee of defendant to recover compensation for personal injuries received by him by the explosion of a locomotive engine, claimed to have been caused by defendant's keeping it in use with knowledge, or reasonable means of knowledge, that it was defective to a degree which rendered such an accident among the natural and reasonable probabilities, and one which, in the exercise of ordinary care, it should have apprehended.

On January 24, 1898, plaintiff was in the employ of defendant as a fireman on its locomotive engine No. 249, then

located at its roundhouse at Madison, Wisconsin. He had no knowledge but that the engine was safe, or of any of the defects which resulted in its destruction and in his injuries. While he was in his proper place in the cab of the engine the engine boiler exploded, casting upon him steam, hot water, and portions of the machinery and material of the engine, whereby he was scalded, one of his legs was broken in several places and crushed, he was badly bruised in and about his face and other portions of his body, and he received other injuries of a serious character. Such facts were all set forth in detail in the complaint, and it was alleged that defects in the boiler, which reasonable and proper inspection would have brought to defendant's knowledge, caused the explosion. The defects mainly pointed out in the complaint were, partial destruction of the boiler plates along the seams by the corrosive action of water, called "grooving," thin places in the boiler plates caused by long use, and worn-out flues. Damages were claimed to the extent of $30,000. The answer put in issue all the allegations charging the defendant with actionable negligence.

On the trial the evidence of defects was confined to grooving, to thin places in the boiler plates caused by the action of the water, called "pitting," some slight evidence of lamination, being places in the plates where the primary plates were not perfectly welded together into a single plate, crystallization of the iron, and weak flues. The principal controversy as to the extent of the injuries plaintiff received was in respect to whether his spine and spinal cord were permanently injured.

There was a special verdict, finding as facts that the locomotive boiler was defective from grooving and pitting, and not from lamination, and that such facts were discoverable before the accident by reasonable and proper tests which should have been applied by the defendant; that such defects caused the explosion of the boiler and were the proxi-

mate cause of plaintiff's injuries; that plaintiff's right leg and spinal cord were permanently injured, and his damages were $11,500. There was the usual motion to set aside the verdict and grant a new trial. Judgment was rendered for plaintiff for the damages assessed by the jury·and for costs.

For the appellant there was a brief by *Fish, Cary, Upham & Black*, attorneys, and *Edward M. Hyzer*, of counsel, and oral argument by *Mr. Hyzer*.

For the respondent there was a brief by *R. M. LaFollette, A. R. Bushnell*, and *G. E. Roe*, and. oral argument by *Mr. LaFollette* and *Mr. Roe*.

MARSHALL, J. The chief controversy on the trial was as to whether the defective condition of the boiler, which caused the explosion, ought to have been discovered by the defendant before that event, and guarded against. To cover that field by the special verdict, defendant's attorneys requested the court to submit for answers these four questions: "Could the defects have been discovered without removing the flues from such boiler?" "Was it the ordinary custom and practice among persons generally, using locomotive boilers of a like kind, under similar circumstances, to remove the flues for the purpose, only, of inspecting the shell of such boiler?" "Was the boiler of engine No. 249, up to the time it exploded, used, operated, treated, and inspected by the defendant in the manner usually and ordinarily followed by persons generally, who use, operate, treat, and inspect locomotive engine boilers of a like kind under similar circumstances?" "If you answer 'Yes' to question No. 10, did such use, operation, treatment, and inspection cause or reveal any defects which caused the injury to plaintiff?" Such questions were rejected and in lieu thereof, following the question of whether the boiler was defective in fact and the nature of the defects, this question was submitted: "If you find in answer to question No. 5 that the boiler was defective at the time of said

explosion, then could the defendant company through its agents and servants, by reasonable and proper care, tests, or inspection, have discovered such defects before the explosion?" In connection with such question the jury were instructed as follows: "Reasonable care as used in this question means such care as ordinarily careful persons exercise under like circumstancess, and reasonable tests and inspections mean such tests and inspections as are made and employed by ordinarily prudent persons engaged in the same business and under like circumstances." That ruling is assigned as error and it appears to be one of the chief grounds of complaint. Appellant's counsel do not contend but that the real fact in issue was, by the court's question as explained, placed before the jury for determination, but they contend that the right of defendant to a special finding as to every material fact in issue, stripped of all conclusions of law, was violated because the question required the application of legal definitions and explanations in order to enable the jury to properly answer it, the result being that the final conclusion embodied in the answer was rather a conclusion of law than one of fact; and in support of that a lengthy argument upon the character of a special verdict under the statute was presented.

It seems hardly necessary at this day to discuss questions so elementary as what constitutes a special verdict. It is a finding upon all the material issues of fact raised by the pleadings. A failure to distinguish between such facts and the numerous evidentiary circumstances which may be the subjects of controversy on the evidence and are relied upon to establish the ultimate facts upon which the case turns, often leads to unjust criticism of a special verdict. A conclusion is not one of law because it is reached by a process of reasoning from many primary circumstances. While such circumstances may be in dispute, the real question is, Do they lead with reasonable certainty to, and establish,

the fact alleged by the pleading upon the one side and denied by the pleading upon the other? If the subject of the allegation in the complaint be one of law, or of mere evidence, it has no proper place in the pleading, and hence no necessary place in the special verdict. By the complaint, certain facts are alleged to exist constituting the plaintiff's cause of action and warranting the remedy sought. Those facts, if put in issue by the answer, and controverted on the evidence, in case of a special verdict, must appear to exist thereby, or the conclusion of law must be against the plaintiff. The object of a special verdict is solely to obtain a decision of issues of fact raised by the pleadings, not to decide disputes between witnesses as to minor facts, even if such minor facts are essential to and establish, by inference or otherwise, the main fact. *Goesel v. Davis*, 100 Wis. 678; *Eberhardt v. Sanger*, 51 Wis. 72; *Jewell v. C., St. P. & M. R. Co.* 54 Wis. 610; *Klochinski v. Shores L. Co.* 93 Wis. 417; *Ward v. C., M. & St. P. R. Co.* 102 Wis. 215. A strict compliance with this rule requires that the verdict be made up of sufficient questions to at least cover, singly, every fact in issue under the pleadings. If that could always be kept in view, the legitimate purpose of such a verdict in promoting the administration of justice would be uniformly accomplished, and the opinion entertained by some that its use is harmful would cease to exist.

Testing the ruling of the trial court by what has been said, it is free from any reasonable criticism. Neither of the questions which were refused called for a response to any issue raised by the pleadings. Each called for a finding as to some essential as a matter of law to, or bearing on the existence of, the main fact, each being, however, of a strictly evidentiary character. The real fact in issue was as to whether the condition of the boiler which caused the explosion ought to have been known to the defendant. The question submitted plainly covered that subject. The degree

of care with which defendant was chargeable was strictly a legal question. · Whether that degree of care was exercised in the instance under consideration was strictly a question of fact. The instruction properly laid down the law for the guidance of the jury, and the question called for an answer as to whether the defendant came up to the legal standard in the particular instance. The jury were thus called upon to find the fact, not the evidence of the fact, leaving it to the court to apply thereto the proper legal principles. No doubt the finding of evidentiary facts is sometimes helpful in tying the jury down to the precise question in controversy, by keeping before them the barriers they must overcome in order to reach the conclusion contended for by plaintiff; but so long as the ultimate question is properly one of fact, or of mixed law and fact properly pleadable as matter of fact, and essential to the cause of action upon which a recovery is sought, it is strictly the proper subject of a question, and those facts from which it is or may be inferable may properly be omitted.

The idea advanced by counsel for the defendant that the statutory right to a special verdict is only satisfied by questions that do not need to be considered in the light of legal principles given to the jury by the court, is contrary to the universal practice and the settled law upon the subject. Often, whether certain conduct complained of is negligence, where the evidentiary facts are all established, is a question of fact, in respect to which different minds may reasonably come to different conclusions. In that situation it is necessary to carefully instruct the jury regarding the standard of care necessary to the performance of the duty alleged to have been violated, leaving it to them to determine whether the alleged wrongdoer came up to the legal standard in the particular instance complained of. The question of contributory negligence, of proximate cause, and what is reasonable, are only, ordinarily, determinable by viewing evi-

dentiary facts in the light of legal principles. The ultimate fact being only properly determinable by viewing evidentiary facts in the light of legal standards, instructions by the court in regard to such standards are necessary. When such ultimate facts are established, the legal liability follows as a conclusion of law. At that point the jury should not be instructed. They are to find the facts, guided by the law regarding such facts, but regardless of the legal effect of their conclusions. The issues of fact raised by the pleadings are to be passed upon by the jury. The legal conclusion to be drawn from such findings is to be referred to the court with an additional conclusion by the jury, express or implied, that if the court should be of the opinion, upon the whole case, as found, that plaintiff has a good cause of action, they find for the plaintiff, otherwise for the defendant. *Suydam v. Williamson*, 20 How. 427.

What has been said is in perfect harmony with the opinion in *Lee v. C., St. P., M. & O. R. Co.* 101 Wis. 352. The difficulty there was that the specific acts constituting the breach of duty complained of, put in issue by the answer, were not found by the jury. The error assigned here is, that circumstantial evidence of the fact in issue was not found by the jury, which is quite another question. The reversible error found in *Bigelow v. Danielson*, 102 Wis. 470, was of the same character as that in *Ward v. C., M. & St. P. R. Co.* 102 Wis. 215. The legal result which the plaintiff claimed for the specific acts of negligence set forth in the complaint was covered by the questions, instead of the acts themselves. It was to that situation that Mr. Justice BARDEEN used the language which the learned counsel for appellant, in their printed argument, press upon our attention to support their contention that the jury should have been permitted to find the evidence instead of the ultimate facts; that is, "when a special verdict was demanded, it became the duty of the court to submit these matters to the jury in

Baxter vs. Chicago & Northwestern R. Co.

such form that they might determine the facts so presented and not the conclusions to be derived therefrom." The term "these matters," in the quoted language, refers to facts set forth in the complaint,— facts constituting the negligence complained of,— which the special verdict in question here amply covered. The use which the learned attorneys for appellant make of the language of this court in *Ward v. C., M. & St. P. R. Co., supra,* is quite as unwarranted as that in the other case referred to. The error consisted of submitting the case for a general verdict, with a general charge in connection with a special verdict, when the right to the latter was exercised and a general verdict was excepted to. The submission of general questions covering specific facts in issue, with instructions confined to such questions, was said to be a proper practice, and that the instructions should go no further; that questions may be submitted covering facts essential to the main facts, though it is not error to refuse to do so.

With what has been said we leave this branch of the case. The matter has been discussed at considerable length because the attorneys for the appellant put much labor upon it and appear to think that recent expressions of this court, in connection with the history of the subject of special verdicts, support their assignment of error that the verdict here does not pass on all of the issues of fact. If the doctrine, pressed upon us as if it were a new subject for decision, that every issue of fact essential to the plaintiff's case must be passed upon by the jury by single, direct questions, in order to satisfy the right to a special verdict, be applied, as it must be, to issues made by the pleadings, all the suggested difficulties with reference to the form of the verdict complained of will quickly disappear.

It is hoped, if there is any doubt about the proper practice in submitting a cause for a special verdict,— if there exists any confusion that should be dispelled by this court,

as is suggested by appellant's attorneys,— that what has been said will accomplish the desired result. It is not considered, however, that there is any such confusion. This court has iterated and reiterated the doctrine that special verdicts should consist of a sufficient number of plain, single questions, calling for direct answers, to cover the facts in issue on the pleadings and which must be found in the plaintiff's favor to make out his cause of action. *Bell v. Shafer*, 58 Wis. 223; *Kerkhof v. Atlas P. Co.* 68 Wis. 674; *Montreal River L. Co. v. Mihills*, 80 Wis. 540; *Ohlweiler v. Lohmann*, 88 Wis. 75; *Farley v. C., M. & St. P. R. Co.* 89 Wis. 206; *Haley v. Jump River L. Co.* 81 Wis. 412; *Lee v. C., St. P., M. & O. R. Co.* 101 Wis. 352; *Bigelow v. Danielson*, 102 Wis. 470. So far there is no discretion in the trial court. The form of the questions is largely under the discretionary control of the court; and where the existence of concurring elements is necessary to an essential ultimate fact, or where such ultimate fact is dependent upon some one or more evidentiary facts, it is not error to refuse to submit questions covering such elements or minor facts; but in accord with the rule stated the court may confine the questions to ultimate facts, yet it may broaden out the verdict so as to cover essential elements thereof, or evidentiary facts. Such a verdict, containing a large number of questions covering mere minor facts and reasons for conclusions, has often been condemned, yet the ends of justice will no doubt often be promoted by questions not strictly necessary, which guide the jury by a logical process of reasoning to the proper conclusion as to the real subject of inquiry. *Deisenrieter v. Kraus-Merkel M. Co.* 97 Wis. 279; *Schumaker v. Heinemann*, 99 Wis. 251; *Raymond v. Keseberg*, 98 Wis. 317. Further, it is proper, and on request it is error to refuse, to give instructions requested as to each question submitted, that may be reasonably necessary to enable the jury to answer it intelligently and according to

the law governing the subject.  But no instructions as to the effect of an answer upon the ultimate rights of the parties is proper.  *Ryan v. Rockford Ins. Co.* 77 Wis. 611;  *Ward v. C., M. & St. P. R. Co.* 102 Wis. 215.

Defendant's attorneys requested the submission of a question covering the essential element of proximate cause, of whether defendant ought, in the light of attending circumstances, to have apprehended that the condition of the boiler might cause a personal injury to some person.  That was refused, but a general question, covering the subject of proximate cause, was submitted in connection with instructions somewhat inaccurate but on the whole free from harmful error.  The question submitted was as follows: "If you find that the boiler exploded by reason of a defect, in answer to question No. 5, then was such defective condition of said boiler the proximate cause of the plaintiff's injuries."  The instruction was in line with the question in that it referred to the inquiry as being whether the *defect* which caused the explosion was the proximate cause of plaintiff's injuries.  It is contended that a finding that the defective condition of the boiler was the proximate cause of plaintiff's injuries, is not a finding that defendant's negligence was the proximate cause of such injuries.  The jury said that the conditions which caused the explosion, according to the verdict, are chargeable to defendant's negligence; that it knew of the defects, or ought to have known of them, and in the exercise of ordinary care ought to have apprehended that the result which followed in consequence of such defects might probably occur.  That, in effect, found that the defendant's negligence was the proximate cause of plaintiff's injuries.  The mere form of the finding, criticised in that the defect, instead of negligence, was referred to as the proximate cause, is of no consequence.  The finding determined that the defendant was guilty of a negligent act in permitting the use of a dangerously defective locomotive; that its responsible

officers and agents ought, in the exercise of ordinary care, to have apprehended an accident like that which occurred. That, clearly, in substance, found that the accident and the injury to plaintiff were the natural and probable results of defendant's actionable fault. All those things which were natural and probable defendant ought to have foreseen as likely to occur, and if, from the condition of the boiler, for which it was responsible, it ought reasonably to have apprehended the explosion as among the reasonable probabilities, then that event was a natural and probable result of its conduct. Under the circumstances, whether the term be used that the defect in the boiler, or defendant's negligence, was the proximate cause, is unimportant. Either means the same as the other. Strict accuracy is not required.

In the instructions the learned court several times spoke of the proximate cause as the direct and natural cause, instead of the natural and probable cause; but the error was not harmful, since language was used, several times, limiting the term "direct and natural" to what defendant, in the exercise of ordinary care, ought reasonably to have apprehended. It is somewhat strange that false notions of what constitutes proximate cause in the law of negligence became so grounded in many professional minds that the real philosophy of the subject cannot apparently be grasped and understood, notwithstanding the many clear elucidations of it given by this court, especially in recent years. A study of the following cases is commended: *Atkinson v. Goodrich Transp. Co.* 60 Wis. 141; *Andrews v. C., M. & St. P. R. Co.* 96 Wis. 348; *Deisenrieter v. Kraus-Merkel M. Co.* 97 Wis. 279.

Answers were allowed, against objections, to questions propounded to a witness, Dodge, called as an expert, as to what kind of an inspection such a boiler as the one in question should receive in order to determine its safety. Error is assigned on that, first, because the competency of the witness was not shown, and second, because the test of whether de-

fendant failed to perform its duty was not whether it did what an expert, or person claimed to be an expert, in the examination of boilers might say was necessary to discover defects, but whether the defendant's conduct in the care of its boilers came up to the standard of persons generally engaged in the same line of business. The conclusive answer to the first contention is that the evidence abundantly shows that the witness was qualified to testify as an expert on the question of what is the proper method of inspecting boilers to discover such defects as were claimed to exist in the boiler in question; and to the second ground of objection, that while it is true that the test of ordinary care in the particular instance is what is generally done under similar circumstances, the defendant was not harmed by what the witness said was necessary or proper, because his testimony was in accord with that of defendant's witnesses. Dodge did not state how often boilers should be tested, but stated the nature of the inspection required to discover defects, particularly that of grooving. He said that the inspector should go inside of the boiler, the flues being removed, using a light, so that defects can be readily observed if there are any; that he should, using a hammer and chisel, remove all dirt. Defendant produced testimony that its practice was to inspect boilers for certain defects every thirty days, also to inspect the engine, to some extent, every round trip; also, at certain intervals, to give the boiler a general inspection by taking out the flues, going inside of the shell with a light and removing all scales and dirt, and looking carefully for imperfections. Testimony was also produced showing that such was the general custom of railroad companies. There was not an entire agreement between defendant's witnesses as to the customary frequency of inspection, but there was nothing out of harmony with the evidence of Dodge in regard to the character of the inspection. His evidence simply tended to show that the customary inspection of locomotive

boilers, which was followed by the defendant, was in accord with what was reasonably required in order to discover defects if any existed. So the rule, that the standard of care for which defendant was responsible was that exercised by railroad companies generally, so far as such practice was not obviously insufficient, was not violated in the slightest degree by admitting the evidence objected to. If the custom established.had not come up to the standard testified to by Dodge, there would be some ground for saying the admission of his evidence was harmful error, if objectionable upon any ground. But under the circumstances it tends to remove any possible claim that the general practice of the defendant was not free from negligence. Whether such practice was followed in the particular instance, and whether it was adequate considering the great age of the engine that caused the mischief, may be another question.

A witness of twenty-five years' experience in handling engines and machinery, and in observing the tendency of iron to become crystallized by age, was permitted, against objection, to give his opinion upon that point. That is assigned as error upon the ground that the witness was not competent to give such opinion evidence, because not schooled as a mechanic or experienced as a manufacturer. Neither was a requisite to the qualification of the witness. Practical experience, sufficient to fairly show that the witness possessed peculiar knowledge, rendering his opinion entitled to consideration as coming from a person possessed of more than ordinary information on a question properly the subject of opinion evidence, was sufficient. The witness came up to that standard.

The court permitted a witness, who appears to have been qualified to give opinion evidence, to testify regarding the limits of safe boiler pressure on the supposition that the boiler contained a groove or thin sheet clear around, reducing its thickness in the entire circumference to the extent

of two thirds. That was clearly error. There was no evidence in the case to establish any such condition in regard to the boiler in question. The evidence on the subject was that there were grooves along seams, some being from twelve to fifteen inches in length. There was no proof of grooves along all the seams or clear around the boiler shell,— none whatever. If it were not for the fact that we are unable to see how the defendant could have been prejudiced by this testimony, as to the cause of the explosion, the admission of it would not only be fatal to the judgment, but a new trial would in any event be necessary. There is no controversy but that the boiler exploded because of imperfections, and that such imperfections consisted of what are called "grooving" and "pitting." True, the question of the existence of defects was submitted to the jury, as well as whether the explosion was caused thereby, but as we read the evidence the case on the part of the plaintiff was conclusive on both questions. No defense was made to it by the defendant, or explanation offered to otherwise account for the explosion, and no reasonable theory was advanced or exists, to account for the accident, except the imperfections found by the jury, and it appears that that must have been the cause. So, as we view the record, the introduction of the irrelevant evidence did not prejudice the defendant as to its legal liability, but it had a strong tendency to create in the minds of the jury a feeling that defendant's conduct was something worse than mere want of ordinary care,— something bordering on a reckless disregard of the safety of its employees. Experience shows that the minds of jurors are often influenced by such methods in cases where humble station is represented on one side of a controversy and wealth and power, especially that of a corporate organization, is represented on the other, the result often being that loss caused by a personal injury is measured, not by the legal standard of compensation alone, as it should be, but of ability to pay, with some

Baxter vs. Chicago & Northwestern R. Co.

element of punishment for the benefit of the plaintiff, as well. Whether there was such a departure from the correct standard in this case cannot be determined with certainty. It is sufficient for the appellant's purpose that the tendency was strong that way, and that a finding by the jury, made clearly contrary to the evidence, as will be shown later, pretty conclusively shows that they were unduly influenced by such irrelevant evidence, or some other cause. There was proof of one or two laminated spots on the under part of the boiler, not sufficient in extent, however, to materially weaken it. Moreover, such spots were in a different place from that where the rupture in the boiler plates occurred. We regard the proof as undisputed and conclusive that a weakening of the boiler by grooving and pitting caused the explosion, hence the evidence of what pressure would be safe for a boiler of three-eighths inch iron, grooved clear around two thirds of the way through, had no material effect upon the result of the trial as to defendant's legal liability. The real controversy as to defendant's responsibility was regarding whether its officers or agents knew or ought to have known of the weakened condition of the boiler.

A small portion of a boiler flue, taken from the wrecked engine, was offered in evidence to show that the flues were worn and weakened as alleged in the complaint. It is claimed that such evidence did not prove or tend to prove the existence of any condition which caused the accident; that the bursting of a flue would have reduced the pressure on the boiler shell instead of increased it. That is true. It is evident that the evidence was not offered to show a weakness in the boiler which caused the accident. The purpose, as it appears, was to show a generally worn-out condition of the boiler as bearing on the important question of whether defendant was guilty of negligence in regard to inspecting it for defects. A generally neglected condition of the inside structure of the boiler had a material bearing on that branch of the case. *McHugh v. Minocqua,* 102 Wis. 291.

Baxter vs. Chicago & Northwestern R. Co.

Opinion evidence was allowed of the probable time required for grooves to form in a boiler, two thirds through plates three eighths of an inch thick, and the effect of such defects, and of long-continued use, on the strength of the boiler. That was objected to, first, for want of qualification of the witnesses; second, because the hypothetical questions propounded to them did not present all the material facts testified to in the case. Neither ground of objection is sustained by the record. The witnesses were men of large experience in the use and inspection of boilers and in observing the effect upon them of the particular matters to which their answers were directed. The hypothetical questions referred to the age of the boiler, the length of time it had been in use, and the depth of the grooves. Those were the material points that had been testified to and substantially all of them. If there were other circumstances which would have affected the opinions, not theretofore brought out by the evidence, there was ample opportunity, by cross-examination, to place the information before the jury.

Photographs were received in evidence in respect to plaintiff's injured as compared with his uninjured leg. One photograph showed him sitting on a chair and the other standing, partially supported by a crutch and a brace on his injured leg. They were verified as correct representations by the artist who made them. They were taken by the jury to their room and examined there by them in arriving at the conclusion embodied in the verdict. There is a limit to the use of photographs as evidence, and it was nearly, if not quite, reached in this case. They are competent for some, but not for all, purposes. They may be used to identify persons, places, and things, to exhibit particular locations or objects where it is important that the jury should have a clear idea of the same, and the photographs will better show the situation than will the testimony of witnesses, and where the testimony of witnesses will be better understood by the use of

photographs, and to detect forgeries, and to prove documents
in cases where originals cannot be readily produced. There
must be some substantial, legitimate reason for the use of
such representations, else they should not be received. For
the purposes indicated photographs have been frequently
used for many years in the courts of this and other countries.
*Church v. Milwaukee*, 31 Wis. 512; *Luco v. U. S.* 23 How.
515; *Blair v. Pelham*, 118 Mass. 420; *Marcy v. Barnes*, 16
Gray, 161; *Re Stephens*, L. R. 9 C. P. 187; *Malachi v. State*,
89 Ala. 134; *Duffin v. People*, 107 Ill. 113; *Maclean v. Scripps*,
52 Mich. 245; *Archer v. N. Y., N. H. & H. R. Co.* 106 N. Y.
589. On the occasion in question none of the reasons seems
to have been present. There was no difficulty whatever in
the witnesses describing the plaintiff's injured leg. The ex-
perts upon both sides did that. The leg might have been
exhibited to the jury. However, in *Alberti v. N. Y., L. E.
& W. R. Co.* 118 N. Y. 77, similar evidence was held proper,
and in *Barker v. Perry*, 67 Iowa, 146, it was held proper to
permit the jury to take photographs to the jury room. It is
the general rule that courts have a broad discretionary con-
trol over what instruments of evidence the jury may have
during their deliberations. *Starke v. Wolf*, 90 Wis. 434. We
are unable to say that the defendant was prejudiced by the
introduction of the photographs or the use of them com-
plained of. As indicated, witnesses were present in defend-
ant's behalf who had examined the injured leg, and must
have known whether the photographs correctly represented
it or not. Presumably they were correct representations,
inasmuch as the artist who took them so testified, the de-
scriptions given by the witnesses accord with them, and the
defendant did not request that the jury should have a view
of the injured member.

There are several other assignments of error, each of which
has received careful consideration. None has been either
overlooked or passed without study. The foregoing, how-

Baxter vs. Chicago & Northwestern R. Co.

ever, covers all questions that appear to be of sufficient importance to warrant special mention in this opinion, except the one regarding whether the finding of the jury, that plaintiff's spinal cord is permanently injured, is warranted by the evidence.   The evidence bearing on that question is in substance as follows: Plaintiff testified that he was not conscious of any loss of sensation in any part of his body; that he could lie down flat upon his back and rise to a sitting posture without assisting himself with his hands, though it caused him some pain.   After giving that evidence, and on rebuttal, when the importance of it became apparent, the plaintiff testified that he could not rise from a perfectly prone to a sitting posture without the use of his hands.   Dr. Gill, for plaintiff, said he discovered that movements of the spinal column caused plaintiff pain in the region of the first, second, and third lumbar vertebræ; that there was tenderness at that point; that there was no injury to the spinal column itself, and no outward indication of injury; that an electrical test applied to the muscles showed that those on the right side, which are dependent for muscular energy upon the motor nerve having its root in the anterior horn of the spinal cord in the region of the first and second lumbar vertebræ, were impaired, indicating that the cord at that point was diseased; that there was, particularly, an absence of the patella reflex, a pretty certain indication of disease of the spinal cord at the point mentioned; that the roots of the motor and sensory nerves in the spinal cord are near together; that the fibers unite immediately after emerging therefrom, mix, yet preserve their identity, and travel together to the extremities of the muscles and tissues which they control; that an injury to the motor cells of the spinal cord, with no effect upon the companion sensory cells, is natural and probable; that it existed in this case; that in his opinion, plaintiff's spinal cord in the region of the first and second lumbar vertebræ is permanently injured.   He further

testified that the plaintiff performed the feat of rising from a prone to a sitting posture without the aid of his hands. Dr. Rodney Fox, who assisted in an examination of the plaintiff, testified that he discovered no indication of spinal-cord injury; that he did not make a special examination therefor, but that in his opinion, from what he observed, plaintiff was not suffering from such an injury. The witness's testimony was based on having treated plaintiff for his injuries, on having examined him personally several times, and been present and assisted at an examination of him three days before the trial. He said that he did not at any time discover any injury to any portion of the spinal column or cord. Dr. Philip Fox testified that he treated plaintiff for his injuries, saw him on an average of twice a week for a couple of months after the accident, and assisted at the examination three days before the trial; that nonuse of his right leg would account for all conditions found by Dr. Gill which he attributed to a spinal-cord injury; that in his opinion it was impossible that plaintiff could be suffering from such an injury, manifested only by impairment of the functions of the motor nerves; that in his experience he had never known of a case of diseased spinal cord without sensation as well as motion being affected; that if one's left arm be kept out of, and the other arm kept in, use for a month, the difference in the conditions of the two arms would be found quite similar to that found by Dr. Gill in plaintiff's legs; that other causes than spinal-cord injury will show a difference in the conditions of corresponding muscles under an electrical test. Dr. Sifton testified that he made a careful examination of the plaintiff three days before the trial; that he had seen and examined him several times previous to that; that in his opinion he was not suffering from any injury to the spinal cord; that such an injury in the region of the first and second lumbar segments, affecting motor functions only, was impossible; that the anterior or motor

nerve roots are so near to the sensory nerve roots that it is practically impossible to so disturb the substance of the cord as to affect one and not the other; that no such case has ever been recorded; that in all spinal-cord injuries he had observed there was always a disturbance of motor as well as sensory functions; that in arising from a prone to a sitting posture four muscles, two on each side, are brought into use, principally, and that the nerves controlling them come from the spinal cord through the second and third lumbar fringes and second and third lumbar vertebræ; that an injury at that point, affecting the motor cells, would destroy them; that there can be no such thing as partial destruction of nerve cells; that there are no instances of disease of the spinal cord so limited to the motor nerve cells on one side as to show no other disturbance; that such a thing is practically impossible; that the absence of patella reflex, as testified to by Gill, was a natural result of the atrophied condition of the plaintiff's leg from nonuse; that absence of such reflex may or may not indicate spinal-cord injury; that, alone, it does not indicate such an injury; that it may be entirely absent and the spinal cord be in a normal condition.

Three physicians, testifying on the side of the defendant, apparently of equal ability, credibility, and opportunities with the witness on the side of the plaintiff for knowing the latter's condition, were in harmony on the point that plaintiff was not suffering from any injury to the spinal cord. In support of their opinion are the facts that plaintiff can arise from a prone, or nearly a prone, position to a sitting posture without the aid of his hands; that such feat requires the use, to about the utmost limit, of muscles in a normal condition, controlled by motor nerves having their roots in the spinal cord in the region of the first and second lumbar vertebræ, the point of alleged permanent injury; that a condition of the muscles, requisite to the exertion plaintiff is capable of making, is inconsistent with an impairment of the cord; that

the sensory cells of the cord at the alleged point of impair-
ment are in a normal condition, as evidenced by there being
no loss whatever of sensation in any part of the muscles de-
pendent therefor upon the sensory nerves centering in the
cord at such point; that the motor nerve root has a compan-
ion sensory nerve root located in close proximity to it, and
that the two species of nerve fiber mix upon leaving the spinal
cord, though preserving their respective identities, travel to-
gether, and permeate the muscles they control, rendering it
highly improbable that the cord can be impaired at the motor
root without impairment of its companion nerve; that non-
use of the muscles of the plaintiff's right leg would naturally
cause an abnormal condition of such muscles, which would be
manifested by such electrical tests as those from the results
of which plaintiff's witness concluded that the spinal cord
was permanently impaired. These facts, and the improbabil-
ity mentioned, constitute almost, if not quite, a demonstra-
tion that the plaintiff's spinal cord is not diseased. Mere
opinion evidence, at best, is to be received and scrutinized
with the greatest care. It is, ordinarily, the most uncertain
kind of evidence that can be produced, and falls to the ground
as utterly worthless when inconsistent with undisputed facts
or with reason and common sense as applied to other cred-
ible evidence.

We might proceed at great length to discuss the evidence
of the four experts and show that the evidence of those who
agreed that plaintiff's spinal cord is in a normal condition,
independent of the physical facts established, preponderates
clearly against the contrary view; but that is not necessary,
nor would it be helpful in future litigation, because mere
preponderance of evidence is not sufficient to warrant sus-
taining the assignment of error. The situation, as we view
it, is this: The finding of the jury that plaintiff's spinal cord
is permanently impaired rests upon the uncorroborated
opinion of one witness, which is inconsistent with, and dem-

onstrated to be wrong by, undisputed facts and all the reasonable probabilities, besides being opposed by three equally competent witnesses whose evidence is in harmony with such facts and probabilities. In such a situation a verdict cannot stand. *Badger v. Janesville Cotton Mills,* 95 Wis. 599; *Vorbrich v. Geuder & P. Mfg. Co.* 96 Wis. 277; *Cawley v. La Crosse City R. Co.* 101 Wis. 145; *Wunderlich v. Palatine F. Ins. Co., post,* p. 382. Opinion evidence alone is not conclusive in any case. The jury must pass upon the probabilities, and unless the opinion relied on is within the scope of reason and common sense it should not be regarded at all. If that were not so, injustice would often rule in the jury room, because, in a case like this, or any case involving a personal injury, there is no theory so preposterous but that men can be procured to support it under oath from the witness stand by expert evidence. On questions involving skill and experience in such matters, experts must be called from the necessities of the case, for want of better evidence; and when stripped of all the elements of mere conjecture, and pretense, and partisan influence, it is valuable, and what is left will rarely appear improbable to ordinary comprehension. It is the duty of courts and juries to do that,— to subject expert opinions to all reasonable tests to determine their credibility. In doing that here, we find that the opinion that plaintiff's spinal cord is diseased in the region of the first and second lumbar vertebræ, based on the fact, principally, of a loss in the contracting power of the muscles controlled by the motor nerve which proceeds from that point is not reasonable, because no impaired condition of the companion sensory nerve fiber exists, because some of the muscles, controlled by the same motor nerve that controls those showing weakness, are in a normal condition; that it is neither reasonable nor possible that the nerve root can be impaired and some of the muscles controlled by it remain in their normal condition. . On the other hand it is plainly

reasonable that nonuse of muscles will result in loss of muscular energy and of contracting power, evidenced by an electrical test, and that a normal condition of muscles, in daily use, and abnormal condition of those long out of use, both sets dependent upon the same source for motor energy, render it highly probable that nonuse, and not a disease of the nerve at its source, is the cause of the abnormal condition. Thus, the two processes of reasoning reach the same result,— that the opinion that the spinal cord is diseased is mere conjecture, or the result of false reasoning, or of that bias which experience shows so often takes hold of a skilled witness with apparently resistless power.

As before indicated, the ease with which experts can be arrayed on each side of a controversy, especially where the human anatomy and human afflictions, their cause and probable results, are the subject of judicial inquiry, and two theories be sustained by the evidence of reputable men skilled in their calling, each theory fitting with exactness the necessities of the side on which it is advanced, is an unexplainable mental phenomenon which all have experienced who have had much to do with the trial of cases. It leads to the adoption, as a rule of law, of the expression of Lord CAMPBELL, often quoted by text writers, that skilled witnesses come with such a bias on their minds that hardly any weight should be given to their evidence. *Tracy Peerage,* 10 Clark & F. 191. It seems that if a person is called as a witness to support one side of a controversy by opinion evidence, he is quite likely to espouse such side with all the zeal of blind partisanship, to view the situation from the point of interest and necessity of that one side of the controversy with such a degree of mental concentration as to shut out of view everything not within that narrow focus, inducing a mental condition of entire incapability of giving an independent, impartial opinion, and capability only of acting in the line which the interest of the one side suggests, with as much

certainty as the hypnotized follows the mental suggestion
of the hypnotizer. Many courts have had occasion to speak
of this, and, while maintaining the importance of expert
evidence, have condemned in strong language its abuse, and
urged the importance of weighing it with the greatest cau-
tion and not accepting it as controlling where inconsistent
with reason and common sense. Wharton, Ev. § 454, and
cases cited; *Winans v. N. Y. & E. R. Co.* 21 How. 88; *Ware
v. Starkey,* 80 Va. 204; 1 Taylor, Ev. § 58; *Grigsby v. Clear
Lake W. W. Co.* 40 Cal. 396.

In the last case cited, Mr. Justice TEMPLE, who delivered
the opinion of the court, said, speaking of expert witnesses,
"It must be painfully evident to every practitioner that
these witnesses are generally but adroit advocates of the
theory upon which the party calling them relies, rather than
impartial experts upon whose judgment and learning the
jury can safely rely." In the same line, Mr. Justice GRIER
remarked, in *Winans v. N. Y. & E. R. Co., supra,* in sub-
stance, experience has shown that opposite opinions of per-
sons professing to be experts may be obtained to any amount;
and it often occurs that their examination results in perplex-
ing, rather than elucidating, the questions involved in a case.

In the light of what has been said it will not do to rely
upon such fallible instruments of evidence as mere opinions,
when in conflict with reasonable probabilities. Otherwise
there will be no safety in submitting one's rights to the de-
termination of a jury in a court of justice. Opinions of ex-
perts must be tested by the same methods as other evidence
for the purpose of determining their credibility, keeping in
view that one fact is of greater weight than any amount of
theory, and so is one probability of greater weight than any
amount of conjecture.

What is here said should not be taken as disparaging at
all the legitimate use of the results of study and experience
in special lines. Such results are very helpful, and in some

Baxter vs. Chicago & Northwestern R. Co.

cases absolutely necessary, in judicial search after truth. When a skilled witness can be kept within his legitimate sphere of impartiality, like a jury or a judge, his evidence will elicit the respect, which is due from all, to the results of study and experience.

We find no reversible error, except the finding that plaintiff's spinal cord was injured and that such injury is permanent, and the allowance of prejudicial, irrelevant evidence of the witness Dodge. For such errors the judgment must be reversed. It would be unfortunate, however, to leave the cause so that a new trial, at all events, would be necessary, since the liability to compensate plaintiff for the injuries he actually received is established without reversible error. Such injuries were of a very serious and painful character, consisting of burns upon the face, neck, head, the upper part of the breast and back, cuts and bruises upon the head and other portions of the body, a very bad fracture of the leg, both bones being broken in several places and the tissues at the points of fracture being so crushed and torn as to nearly sever it, and a shortening of the injured leg one and one-half inches. The character of the injuries was such as to cause plaintiff the most excruciating pain, to wholly disable him from labor for a considerable length of time, at least down to the time of the trial, over a year after the accident. His ability to labor in the future is unquestionably permanently impaired to some extent. He was twenty-nine years of age when injured, and capable of earning from $900 to $1,000 per year. The damages assessed, including that for a permanent injury to the spinal cord, were $11,500. Now it is impossible, of course, to determine with precision what part of that sum was assessed for loss caused by injury to the spinal cord, but a sum may be named that, in all reasonable probability, it does not exceed, and, if deducted from the total, the defendant will have no reason to complain, conceding its liability for the injuries as to which there is no controversy.

To determine a basis for the remission from a verdict of sufficient to cure an error of including therein compensation for an injury that does not in fact exist, is not attended with such difficulty as that for curing an error which merely prejudices the jury, causing them, in assessing damages, to depart from the basis of compensation for actual loss.      We have both situations in this case.      It is settled that a verdict, excessive, resulting from passion or prejudice, can be cured by consent on the part of the plaintiff to such a reduction as in the judgment of the court will, with reasonable certainty, save the rights of the defendant.      *Gillen v. M., St. P. & S. S. M. R. Co.* 91 Wis. 633.      The practice of thus curing errors going only to the amount of damages is constantly broadening in the interest of justice and public economy.      In *Potter v. C. & N. W. R. Co.* 22 Wis. 615, this court said that the rule should not be applied where the excess cannot be clearly ascertained; that to do otherwise would substitute the judgment of the court for that of the jury.      *Corcoran v. Harran,* 55 Wis. 120; *Baker v. Madison,* 62 Wis. 137; *Gillen v. M., St. P. & S. S. M. R. Co., supra; Donovan v. C. & N. W. R. Co.* 93 Wis. 373.      True, in some of the later decisions the expression may be found that the court will not order a *remittitur* unless the excess in the verdict can be definitely ascertained; but it will be found that such expression refers to ordering a reduction of the amount of the recovery and a judgment accordingly, without the consent of either party.      Expressions will also be found to the effect that where a verdict contains improper elements, so that they cannot be separated with certainty from the proper elements of damages, the court cannot do otherwise than to order a new trial, because any other course would be substituting its judgment for that of the jury, apparently going back to *Potter v. C. & N. W. R. Co., supra,* unless the particular situation under consideration be understood.      See *Reed v. Keith,* 99 Wis. 672.      Attention will reveal the situation to have been, that there were no data.

from which the court could fix a sum reasonably certain
not to exceed assessable damages, leaving it for the plaint-
iff to accept or reject it; or the expression was used with
reference to ordering a judgment for a sum less than the
verdict, without the consent of either party. The rule here
discussed is a rule of justice between parties, and to the pub-
lic that has to bear in great part the burdens of litigation,
as well. As stated, in substance, in *Baker v. Madison*, 62
Wis. 137, when plaintiff has demonstrated his right to re-
cover, so there remains no reason to suppose that a new
trial will do more than to change the amount of the ver-
dict, the ends of justice will not be promoted by a new trial,
nor is such a trial necessary to vindicate the rights of either
party if plaintiff will consent to reduce his damages to the
proper sum. In *Donovan v. C. & N. W. R. Co.* 93 Wis. 373,
the practice was as broad as this.

The idea that the practice above discussed usurps the
function of the jury has been rejected by most courts, and
upon grounds that are unquestionably sound. Suth. Dam.
§ 460. There is no good reason to restrict the practice so
as to exclude any case, whether on contract or sounding in
tort, where plaintiff is clearly entitled to recover and a sum
can be named which, in all reasonable probability, will not
exceed the amount which a jury will ultimately give to him.
If the court can name that sum, where the verdict is the
result of passion and prejudice so as not to furnish any guide
whatever, it certainly can in most cases where the only de-
fect is that an element has been included improperly. There
is nothing in *Eviston v. Cramer*, 57 Wis. 570, or *Reed v.
Keith*, 99 Wis. 672, inconsistent with this. The court in
those cases could not determine whether the improper ele-
ment entered into the verdict or not. There were no data
by which the amount awarded for proper elements could be
determined. Here the injuries measured by the verdict are
certain, the principal trouble being that one element was in-
cluded contrary to the evidence. The amount apportioned

Baxter vs. Chicago & Northwestern R. Co.

to that can be justly determined, resolving doubts in favor of the defendant, and the balance be reduced so as to cure, in all reasonable probability, the error of permitting irrelevant evidence, which tended to show a greater degree of disregard for the safety of defendant's employees than it was guilty of, thereby prejudicing the jury against the defendant. In our judgment, a reduction of the plaintiff's compensation to $7,000 will cure the errors referred to so far as in any reasonable probability they prejudiced the defendant. A permanent injury to the spine, such as the witness Gill testified to, is a very serious matter, but we are constrained to believe, from the whole case, that though the jury found the existence of such an impairment, it was so involved in mere conjecture that the undisputed injuries, which may well account for the main part of the verdict, were the chief consideration for it in their minds. In this we do not determine what will adequately compensate plaintiff for his injuries. We simply determine what amount of the $11,500 was probably assessed by the jury for plaintiff's actual injuries, keeping in mind the probable departure by the jury from the legal standard of compensation by reason of prejudicial, irrelevant evidence, and making a proper reduction for that.

It is considered that the disposition made of this case does extend materially, if at all, the practice of avoiding a new trial where a diminution of the amount of the verdict will cure prejudicial errors. It is, at most, but an application of well-known and established principles to new situations. But, if it shall appear to be an extension of such principles, it should not be taken as indicating a tendency to invade or narrow the functions of the jury, but rather as indicating that our jurisprudence is still developing toward that ideal of perfection where the administration of the law is truly the administration of justice.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded for a new trial, but with an

option to the plaintiff, however, to avoid such new trial by electing, within twenty days after the filing of the *remittitur*, to take judgment against the defendant for the sum of $7,000 and costs.

BARDEEN, J. I dissent from the majority opinion on the ground that the admission in evidence of the broken boiler flue was improper and prejudicial to defendant. The negligence of defendant was found to consist in its using a boiler that had become " pitted and grooved." The " weakened, worn, thin, cracked, broken, and insecurely patched " flue is not claimed to have had anything to do with the explosion, and it therefore had no tendency to support the plaintiff's case. Because the flue presented a weakened and defective appearance, the jury might have been led to infer that other portions of the boiler, not seen by them, were equally unsafe. No such inference was proper, because it had no tendency to show the boiler plate was weakened or unsafe.

Giving the plaintiff an option to remit a portion of the damages, admitting that the evidence mentioned was not improper or prejudicial, is going beyond any precedent in the books. It comes so close to the line of usurpation by this court of the functions of the jury that I do not feel like sanctioning the precedent.

DODGE, J. I cannot persuade myself that the question of defendant's care or negligence has been submitted to or passed upon by the jury in this case. The only questions answered (both affirmatively) in the special verdict were — first, whether the explosion occurred by reason of pitting and grooving of the boiler shell; second, whether the defendant " could " have discovered such defects by reasonable care, tests, or inspection before the explosion. Defendant offered evidence that it did not in fact know of such defects,

Baxter vs. Chicago & Northwestern R. Co.

which was rejected, and that it had exercised due and customary care in the way of inspection and repair *within reasonable and customary time before the accident.* Defendant's liability depended on its negligence, not on the existence of defects. Of course, use of the appliance with knowledge of the defect, if obviously dangerous, would be negligence, but that is not in this case. Defendant accepted the burden of proof imposed on it by sec. 1816, Stats. 1898, and offered to disprove knowledge; and knowledge is not found by the verdict. So that the only remaining phase of negligence was the omission of reasonable and customary inspection or tests, as to which testimony was copiously introduced on both sides. So I think that question should have been submitted. If judgment may go against defendant upon the facts found in this verdict, the employer becomes an insurer against every defect in his appliances which could be discovered by an inspection or tests made the moment before an accident occurs, and the question of his due and reasonable care as to frequency of inspections is eliminated. I can see no reason why that is not an element of due care, just as much as is the thoroughness of the inspection when made. The question is, What precautions do ordinarily careful men exercise under like circumstances? A steam boiler cannot be, and in the exercise of ordinary care is not, disemboweled and its interior carefully examined every time steam is to be generated therein, but at intervals. The competent employee knows that, as well as the employer, and he takes the risk of those defects which may develop and cause injury, notwithstanding such inspections at such intervals. He has a right to expect ordinary care, but that is all. In the light of what I have said as to the refusal of the court to permit the jury to find whether the defendant either knew of the defect or was guilty of any negligence in inspection to discover it, I think the question submitted and answered as to proximate cause was insufficient. Doubtless, where a

defendant knows of such a defect as here existed, it is sufficient to find that defect the proximate cause of the injury; but where it does not appear that he knew of it, and it is apparent that the defect has developed since the last inspection, the question whether, in the light of experience and of the customs of others, such defect might reasonably have been expected to develop, so as to make a more recent inspection necessary, should have been passed upon by the jury.

I also concur in the views expressed by Mr. Justice BAR-DEEN as to the impropriety of admitting in evidence the piece of flue.

For these errors I think the cause should be remanded for a new trial. If it were not for them I should concur in the conclusions of the court as to the propriety of allowing judgment to be entered for $7,000, at the option of the plaintiff, as a reasonably certain correction of the erroneous awarding of damages for the unproved injury to the spinal cord.