KINZIGER, Respondent, vs. CHICAGO & NORTHWESTERN RAIL-
WAY COMPANY, Appellant.

*February 27—March. 17, 1914.*

*Railroads: Negligence in stopping train: Injury to passenger:
Damages.*

1. Evidence tending to show that upon the stopping of a freight
   train the bump of the cars in taking up the slack was an un-
   usually hard one and sufficient to throw the plaintiff (a pas-
   senger) and the conductor from their seats in the caboose and
   to cause the conductor to utter emphatic censure of the en-
   gineer, is *held* to sustain a verdict to the effect that the train
   was brought to a standstill in a negligent manner.
2. Although there was proof that causes adequate to produce a
   floating kidney existed before plaintiff's injury, and that the
   symptoms were to some extent the same before and after
   such injury, but more aggravated after it, the evidence con-
   sidered as a whole is *held* to have warranted the jury in
   awarding substantial damages.
3. An award in such case of $3,000 (reduced by the trial court
   from $6,000) is upheld.

     MARSHALL, J., dissents.

APPEAL from a judgment of the circuit court for Oconto
county: W. B. QUINLAN, Circuit Judge. *Affirmed.*

This is an action for damages for personal injury. The
plaintiff was a passenger on a freight train and claimed to
have been injured by falling from her seat in the caboose to
the floor of the car. The failure of duty charged to the de-
fendant was the negligent manner in which the train was
stopped. The defendant contended that the jar which caused
the plaintiff to fall was due to the running in of the slack
after the engine came to a standstill and that such jar was a
necessary incident to the operation of the freight train and
that there was nothing unusual about the manner in which it
was stopped when plaintiff was injured, considering the place
where the stop was made, and that therefore defendant was
not negligent. The jury on a general verdict found this
issue in favor of the plaintiff.

The plaintiff further claimed that the fall produced a dislocation of the right kidney and that thereafter she suffered from a floating kidney and from an obstruction of the flow of urine from the kidney which caused intense pain. The defendant contended that plaintiff had a floating kidney long before the injury · complained of and that such injury resulted in no substantial damage to her. On this issue the jury must have found against the defendant, inasmuch as it returned a verdict assessing plaintiff's damages at $6,000. These damages were held to be grossly excessive by the trial court, and an option was given plaintiff to take a new trial or a judgment for $3,000. She elected to take this latter option, and from the judgment entered defendant appeals.

The question whether the evidence warranted the jury in awarding substantial damages is the closest one in the case. The accident occurred August 24, 1910. According to the testimony of the physicians, the most common causes of floating kidney are straining, lifting, falling, and childbirth. Plaintiff was married in November, 1906, and gave birth to a child early in 1908, and had a miscarriage during the fall of that year. Prior to her marriage she had done what was for a woman heavy farm work, including pitching hay and carrying baskets of potatoes. The winter following her marriage she did the cooking for a crew of twenty-odd men in a logging camp and thereafter did her household work, including washing.

Prior to April 12, 1905, plaintiff suffered pain on the right side of the lower part of the abdomen. She consulted Dr. Minahan, and he diagnosed her trouble as appendicitis and operated on her. It does not appear whether the appendix was diseased or removed. Plaintiff testified that the operation gave her relief from the dull pain which she had, but that some pain remained higher up in the vicinity of the gall bladder, and also that she had a dull pain drawing down the right shoulder and reaching through the back under the

shoulder blade and around in front. Dr. Minahan again examined her in April, 1906, and concluded to make an exploratory operation, the incision being made a little higher up than the former one and apparently in the vicinity of the gall bladder. The trouble was not removed at this time. The gall bladder was found to be in a normal condition and the wound was sewed up without accomplishing anything. Plaintiff further testified that her health was good after this operation until she was injured by the fall in the railway car in 1910. Her attending physician, Dr. Gaunt, testified that the 1906 operation did no good, but that the rest while she was laid up probably did, and furthermore that after the operation he treated her up to and after the accident. He says, however, that he did not treat her for a pain in the side after the second operation and before the accident. The nature of the treatment he did give does not appear. The evidence is undisputed that after the injury the pain in the side became very severe and at times so intense that plaintiff had to be relieved by morphine. Dr. Gaunt testified that the symptoms after the accident were the same as those experienced before the 1906 operation, except that the pain was much more severe. The jury might well have found that a very significant indication of floating kidney developed after the fall in 1910, to wit, excessive voidance of urine. The very severe pains seem to have started about December 1, 1910, and Dr. Gaunt concluded that the trouble was gall stones and that an operation was necessary, but deferred it because the plaintiff was then pregnant. In November, 1911, he operated on plaintiff for gall stones. He found the gall bladder large and drained it, but the operation did not help. In February, 1912, Dr. Connell examined the plaintiff and he diagnosed the disease as Jacksonian bands and operated on her for this trouble. This operation produced no beneficial results. Dr. Minahan was present on this occasion and said he saw the dislocated kidney and it was a

dislocation of several years' standing. Dr. Murphy examined the patient in May, 1912, and concluded that she had a floating kidney. Apparently he was the only physician who had been informed of the excessive discharge of urine at times. Dr. Murphy made his incision from the back, put the kidney in place and stitched it to the posterior wall of the loin. He testified that the excessive pain was due to the kinking of the ureter or tube through which the urine is conveyed from the kidney to the bladder, so as to obstruct the passage of urine through the tube, and also that the operation would result in more or less discomfort, but would save the kidney from destruction. The medical testimony tended to show that the fall on the train was an adequate cause to produce a floating kidney.

*Edward M. Smart,* for the appellant.

For the respondent there was a brief by *Gill & Chase* and *Classon & O'Kelliher,* and oral argument by *D. G. Classon* and *J. B. Chase.*

Barnes, J. It has been thought advisable to set out a fairly full synopsis of the leading facts in the case in order to get an intelligent understanding of the contentions made by appellant's counsel. He urges (1) that causes adequate to produce a floating kidney were shown to exist before the accident; (2) that the symptoms were the same before and after the accident; and (3) that the direct medical proof was to the effect that the floating kidney was of long standing when the February, 1912, operation was performed.

An extended discussion of the evidence would serve no useful purpose. It must we think be conceded that causes adequate to produce a floating kidney were shown to exist prior to the accident. The symptoms before the 1906 operation and after the accident were the same except that the pain was much more severe after the accident than it had been at any time before, and the evidence tended to show that

there was no excessive voidance of urine prior to the injury in 1910. It is not seriously disputed that plaintiff suffered little if any pain in her side after the 1906 operation until she was injured. She testifies that her general health was good, and in this she is corroborated by her mother. It is true, her physician, Dr. Gaunt, testified that he treated her from the time of the second operation until after the injury. The evidence does not show how frequently he treated her or for what trouble, except he says he did not treat her for a pain in the side. During this interval she gave birth to a child and had a miscarriage. So it is apparent that she had need of a physician for ailments other than that of floating kidney. We have then a situation where sufficient causes to produce a floating kidney existed as early as 1905 and symptoms which, in view of the subsequent history of the case, strongly indicated that such was the trouble. But we also have a situation where the jury might well have found that for more than four years after the fruitless operation of 1906 the earlier symptoms had entirely disappeared and the plaintiff was in good health. Then came the fall adequate to produce the result found and the subsequent intense pain and suffering which induced the plaintiff to undergo three very serious surgical operations within a period of six months. The medical testimony leaves us entirely in the dark as to whether a kidney once displaced will return to its normal place without an operation. There is some testimony tending to show that, where there is a dislocation, conditions may be greatly aggravated by a blow on the back. It would appear to be reasonable enough to the layman that a fall such as plaintiff sustained would be very liable to seriously aggravate the condition of the kidney if it was not in a normal condition at the time. If the injury was sufficient, as the doctors testified, to dislocate a normal kidney, it might well produce serious consequences in an abnormal one. We conclude that there was a sufficient basis in the evidence for

awarding substantial damages to the plaintiff and that the judgment entered cannot be held to give an excessive amount. The testimony of Dr. Minahan as to the long-standing character of the trouble cannot be considered controlling. It is of course a mere expression of opinion. His evidence showed that he observed the kidney through the peritoneum when Dr. Connell performed his operation, and no explanation is offered as to how it was possible to tell that the trouble was of more than eighteen months' standing. Dr. Murphy, who sewed the kidney in place and who had a better opportunity to observe it than any one else, testified that the fall in 1910 was sufficient to produce the result which he found.

The evidence was sufficient to warrant the jury in finding that the train was brought to a standstill in a negligent manner. There was evidence strongly tending to show that the bump was an unusually hard one. Besides, there is one very persuasive item of evidence in the case. No one knew better than the conductor whether the stop was of the usual kind or whether it was unnecessarily violent. He was in the caboose when the stop was made and was thrown from his chair by it. The plaintiff testified to what he said in reference to the stop. The statement was more emphatic than elegant and need not be repeated. It clearly indicated that the conductor thought the jar caused by the stop was neither usual nor necessary and that the engineer was not properly doing his work. The conductor does not deny making the statement, although he said he did not remember of having made it.

*By the Court.*—Judgment affirmed.

The following opinion was filed March 23, 1914:

Marshall, J. (*dissenting*). I think the evidence shows, very clearly, that respondent was a sufferer from floating kidney years before the accident. She had been twice oper-

ated upon without discovering her difficulty. She had substantially the same symptoms before the accident as afterwards; not so pronounced, perhaps, but sufficiently significant to move eminent advisers and operators to explore the cavity of the body in front and below the location of the kidneys for some physical infirmity requiring a replacement. The only positive expert evidence in the case given on the precise basis for opinion evidence confirms all direct evidence on this point. I think, from the record, there is not much, if any, doubt but that respondent's injury caused by the fall from the seat consisted of an increase of an old difficulty.

In the circumstances stated, what is the duty of this court? Is it to allow the verdict to have full efficiency upon the theory the fall from the seat produced the floating kidney and that respondent had no such difficulty during the period immediately before the fall, when that course would rest on the merest conjecture, and hardly that, and is opposed by substantially all the affirmative evidence, direct as well as circumstantial? This court has said, and it is one of the vital principles of our system of jurisprudence, where controversies as to facts must be settled by jury interference, that no amount of mere possibility or conjecture can afford sufficient weight to support a probability, much less a reasonable certainty. When a verdict is allowed to stand in violation of that salutary principle, the jury system is discredited. It should have its proper dignity. That dignity is great and commanding where there is any basis for diverse reasonable inferences. Where there is not, it has no function to perform at all. To arouse it to activity and to rest upon its baseless fiat, gives the law the cast of an instrumentality of wrong rather than of justice.

Now the award of damages, below, was made by the jury and modified, though allowed to stand, by the court, upon the theory that the respondent was not afflicted with floating kidney prior to her fall from the seat. As I do not think there

is any fair basis for that, I cannot escape the conclusion that the verdict is excessive. As before indicated, there was pretty strong evidence that the fall, moderately, increased a prior long-standing infirmity, and the award of damages should therefore be largely decreased as in *Baxter v. C. & N. W. R. Co.* 104 Wis. 307, 80 N. W. 644, so as to cure the infirmity, and so emphatically as to avoid prejudicing appellant by compelling it to submit to the modified award without a new trial.